Filed 5/20/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B236009 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA091346) |
| v. | |
| JORGE RAMIREZ FERNANDEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Douglas W. Sortino, Judge. Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Victoria B. Wilson, Supervising Deputy Attorney General, and Erika D. Jackson, Deputy Attorney General, for Plaintiff and Respondent.

_____

Jorge Fernandez appeals from his convictions for sexual abuse of his granddaughters. He contends (1) he was denied due process when the trial court permitted the prosecution to amend the information during trial; (2) instructional errors deprived him of a fair trial; (3) prosecutorial misconduct deprived him of a fair trial; and (4) he received ineffective assistance of counsel. We affirm.

## PROCEDURAL BACKGROUND

An information charged appellant with the five felony offenses: lewd act on a child under the age of 14 (Pen. Code, § 288, subd. (a)[1]; counts 1 [victim, Jane Doe No. 1], 3 and 4 [victim, Jane Doe No, 2]); continuous sexual abuse (§ 288.5, subd. (a); count 2 [victim Jane Doe No. 1]); and oral copulation or sexual penetration with a child under 10 (§ 288.7, subd. (b); count 5 [victim Jane Doe No. 2]).) As to all counts, the information also alleged that the crimes involved more than one victim, within the meaning of section 667.61, subdivision (b).

A 10-day jury trial was conducted from April 12–25, 2011. Following the presentation of the prosecution's case in chief, the trial court granted the prosecutor's motion to dismiss count 1 (§ 1385), and permitted the prosecution to amend the information to change the time periods specified for counts 2 through 5, to conform to proof.

The jury found appellant guilty on all counts, and found true the allegation that the crimes involved more than one victim.

Appellant obtained new counsel and, unsuccessfully, sought a new trial. He was sentenced to state prison for 45 years to life.

## FACTUAL BACKGROUND

*Prosecution Evidence*

*1.      Counts 1 and 2:  Accusations by Jane Doe No. 1*

Jane Doe No. 1 was born in December 1999, and was 11 years old when she testified at trial. Martha D. (Martha) is her mother and Ricardo F. is her father. Martha and Ricardo[2]

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

never married. Jane Doe No. 1 lived with her mother and had visits with her father. Appellant is Jane Doe No. 1's paternal grandfather.

Ricardo got married when Jane Doe No. 1 was very young, and Jane Doe No. 1 frequently visited her father and stepmother's home while they were married. Ricardo divorced in October 2006, when Jane Doe No. 1 was six years old. He moved to Diamond Bar where he lived in his brother Juan's house alone for a time, until Juan and his family and, later, appellant and his wife, Carmen Fernandez, moved in. Jane Doe No. 1 rarely visited Ricardo after his divorce. Ricardo had no one to watch his daughter, and worked long hours and weekends. He also liked to party and stay out at night. Ricardo only picked Jane Doe No. 1 up for visits every two or three months.

In January 2009 Ricardo moved into an apartment in Pomona with appellant and Carmen. Jane Doe No. 1 said that when she visited her father, he often left her alone with her grandparents because he was working or out partying. Ricardo denied having left his daughter alone with appellant.

Jane Doe No. 1 testified that on numerous occasions when she visited Ricardo, appellant touched her breast and her vagina. Sometimes he touched her outside of her clothes, but most of the time he touched her skin under her clothes. Appellant moved his hand around when he touched her breast. Appellant began touching Jane Doe No. 1 when she was in prekindergarten, and it continued while she was in kindergarten, first, second and third grade. He touched her vagina more than 10 times when she was in the second and third grades. The touching occurred when Ricardo lived at the Diamond Bar home and at the apartment in Pomona.

Once, in the house in Diamond Bar when Jane Doe No. 1 was in second or third grade, she was lying on appellant's bed in his bedroom. Appellant was lying down on his side next to her; both of them were clothed. Appellant started touching Jane Doe No. 1's

---

**2** Appellant and several witnesses share the surname "Fernandez." We will refer to those witnesses by their first names.

vagina under her pants. He moved his finger up and down, and inside her vagina. Appellant turned on the television to the Playboy Channel where people were "together naked." He continued to touch Jane Doe No. 1's vagina while he watched TV. Neither he nor Jane Doe No. 1 said anything. Jane Doe No. 1 could not recall how long the touching lasted, but said appellant "usually" stopped if someone came into the room or the house.

On another occasion at the Diamond Bar house, Jane Doe No. 1 was lying on a reclining chair. She was in third grade. Appellant sat on the chair next to her and, using one finger, reached into her pants and moved his finger inside her body, making Jane Doe No. 1 feel "uncomfortable and weird;" she did not like it. She stayed quiet. In the past she had told appellant to stop when he touched her, but he never did. Appellant touched Jane Doe No. 1's vagina " a lot of times" when she was in third grade.

On other occasions, appellant came into the kids' bedroom, put his hands under her shirt and squeezed her breasts with both hands. Jane Doe No. 1 was probably in kindergarten or first grade when appellant began to touch her breasts.

On more than one occasion, appellant showed Jane Doe No. 1 his "privates" and told her to touch it, but she refused. Once when she was eight years old and lying dressed on the bed, appellant took his penis out and showed it to Jane Doe No. 1. It was hairy and wrinkled. Jane Doe No. 1 touched appellant's penis at least once at his insistence.

On several occasions, appellant told Jane Doe 1 to put his penis in her mouth. Once she was sitting on the edge of the bed facing the door and appellant was lying behind her. Appellant told her to look and she saw his "privates." He told her to put it in her mouth. This occurred on several occasions.

Once, appellant held Jane Doe No. 1's hand, forcing her to touch his penis and demonstrating how to move her hand up and down. She kept pulling her hand away. The penis was very hairy.

Someone else was almost always home when appellant touched Jane Doe No. 1. Carmen, in particular, would be in the living room or elsewhere in the house.

4

It took a long time for Jane Doe No. 1 to disclose to her mother what appellant was doing. Jane Doe No. 1 was afraid her mother would get upset or mad, and appellant told her, "'Don't tell nobody. It's a secret.'"

Jane Doe No. 1 was in the third grade when she finally told her mother about the sexual abuse. She first told a school friend who told a school psychologist. The psychologist spoke with Jane Doe No. 1, who said she had lied to her friend. Jane Doe No. 1 did not want people at school to know about what had happened. The counselor contacted Martha on May 29, 2009 and told her about the sexual abuse. Martha and Jane Doe No. 1 went to the police on June 17, 2009. Martha also told Ricardo about the abuse. He went over that day and spoke with Jane Doe No. 1, who started to cry and ran inside the house. Martha obtained a change for Jane Doe No. 1's visitation order to discontinue Ricardo's overnight visits.

Jane Doe No. 1 did not want her mother to tell the police about the abuse because she did not want to hurt appellant. She just wanted Martha to talk to appellant and to make him stop touching her. Jane Doe No. 1 believed he would stop if he knew her mother knew about the touching.

Jane Doe No. 1's health began deteriorating after the disclosure. She developed a cough and asthma, and had trouble sleeping. She underwent counseling and was hospitalized for pneumonia and bronchitis. Her outgoing personality changed, and she became less involved with activities.

On June 29, 2009, Martha met with Carlos, Ricardo's twin brother and the father of Jane Doe No. 2. Carlos asked Martha why Jane Doe No. 1 did not visit the family anymore. Martha told him that appellant had been molesting her daughter. Carlos asked Martha if she was sure. Carlos said he had taken psychology classes and knew that children Jane Doe No. 1's age do not lie. Carlos then made a phone call to find out where his own daughter was. Martha told Carlos he should tell his wife, Paula, about what happened and that he needed to protect Jane Doe No. 2. She told him about the change to Jane Doe No. 1's visitation schedule with Ricardo.

Martha received a call from Paula sometime in May 2010. Martha thought the call was unusual because she and Paula had only spoken three times in 12 years. Paula was

getting a divorce from Carlos, and thought Martha might have some advice for her. When the two women met, Paula asked why Jane Doe No. 1 had stopped spending time with the family. Martha told her appellant had been molesting Jane Doe No. 1. Paula began to cry and said the same thing had happened to Jane Doe No. 2, who had told Paula about the abuse months or a year before.

Ricardo watched from the audience as his daughter testified at appellant's preliminary hearing. Jane Doe No. 1 had difficulty testifying and spoke softly. Ricardo was disappointed, which may have shown on his face. Martha sat next to her daughter while Jane Doe No. 1 testified at the preliminary hearing. Martha noticed that Jane Doe No. 1 was having trouble testifying, and also noticed Ricardo in the audience. He looked upset and maintained an angry posture while Jane Doe No. 1 testified. Ricardo had not seen his daughter since April 2010. He believed she did not need him and it was best if he was not in her life.

2.    *Counts 3, 4 and 5: Accusations by Jane Doe No. 2*

Jane Doe No. 2 was born in September 2001 and was nine years old when she testified at trial. Paula and Carlos are Jane Doe No. 2's parents, and appellant is her paternal grandfather. Jane Doe No. 2 lived out of state with her parents until they separated. She and her mother moved to California in October 2008. The "off and on" relationship between Paula and Carlos remained tumultuous from October 2008 to June 2010. From November 2008 to November 2009, Jane Doe No. 2 lived, variously, with her mother, both of her parents, and her maternal or paternal grandparents. In November 2009, Paula and her daughters (Jane Doe No. 2 has a younger sister) rented an apartment in the same Pomona complex in which appellant and Carmen lived.

While they were living in the same apartment complex, appellant began touching Jane Doe No. 2 when she would visit and sat on the bed in his room to watch TV. Once, appellant came into the room, sat next to Jane Doe No. 2 and touched her skin under her pants and underwear, moving his hand in a circular motion. He also touched her breasts twice with one hand using the same circular motion.

6

Jane Doe No. 2 did not tell anyone about the touching at first because she did not think anyone would believe her. The touching happened most times Jane Doe No. 2 visited appellant's apartment. Other people were in the apartment when it happened, but they did not see it.

Once, when Jane Doe No. 2 spent the night at appellant's house, she was lying on a blanket on the floor and appellant lay down next to her. He touched her "bottom" on her skin. Another time, appellant kissed Jane Doe No. 2 on her "bottom" when she was on his bed. He pulled down her pants and kissed her vagina about six times. She told him to stop three times and tried to push his head away, but he would not stop.

Jane Doe No. 2 waited a while before she told anyone about the abuse. But, after appellant failed to stop, Jane Doe No. 2 finally told her mother in May 2009. Jane Doe No. 2 was in third grade at the time. Paula told Carlos. Outside of Jane Doe No. 2's hearing, her parents agreed they did not believe her accusations, and decided not to confront appellant without proof. Instead, they planned to watch appellant's behavior to see if any abuse occurred and, if it did, to report it. Carlos and Paula told Jane Doe No. 2 they would talk to appellant so she would know that the touching would not happen again, but they did not talk to him.

Paula and Carlos continued to allow Jane Doe No. 2 to spend time at appellant's home, although they made sure someone else was there too. Within two weeks of the time Jane Doe No. 2 told her parents about the molestation, appellant began touching her again. It happened twice during almost every visit. Jane Doe No. 2 did not tell anyone right away that the touching was still happening. Eventually, Paula asked her daughter if appellant was still touching her. When Jane Doe No. 2 confirmed that he was, they went to the police in mid-May 2010.

Mostly, appellant touched Jane Doe No. 2's backside using a circular motion. Once, Jane Doe No. 2 had been sleeping in the same bed as appellant and Carmen, in Ricardo's bedroom. When Carmen left the bed for a time, appellant touched Jane Doe No. 2's bottom under her clothes. The last time he touched her was about two months before Jane Doe No. 2 revealed to her mother that appellant was touching her again.

Carlos testified that he met with Martha on May 29, 2009 because he wanted to know why Jane Doe No. 1 had stopped spending time with the family. Martha said she did not want her daughter around the family because there was too much fighting. She did not tell Carlos about any sexual abuse.

When Paula met with Martha in May 2010, she asked why Jane Doe No. 1 no longer visited the family, and learned that she had been molested by appellant. Paula told Martha that Jane Doe No. 2 had made the same accusations against appellant the year before, and asked Martha why she had not told Paula or Carlos about the sexual abuse. Martha explained that she told Carlos, and assumed that he shared the information with Paula. Carlos denied having spoken with Martha about Jane Doe No. 1's accusations. He said there had been one or two weekends in April 2009 when both Jane Doe No. 1 and Jane Doe No. 2 had overnight visits at the Pomona apartment, and that the girls had a good relationship with one another. He said that when he and Paula first spoke to Jane Doe No. 2 about her accusations against appellant, she told them the same thing had happened to her cousin. He believed his daughter made up the accusations against her grandfather because her cousin had also done so. Carlos said his daughter spent time alone watching television in appellant's bedroom, but he never saw, heard or suspected any improper behavior.

Jane Doe No. 2 did not know appellant had also been touching her cousin, Jane Doe No. 1. The cousins never discussed the allegations and had only seen one another very occasionally for several years before this case went to court. When Jane Doe No. 2, Paula and Carlos had been interviewed by the police in mid-May 2010, Carlos told the interviewer he knew about the allegation because his daughter told him about the touching in July 2009. He did not accuse Jane Doe No. 2 of lying, nor did he claim that she had accused appellant only because her cousin had done so. Carlos thought Paula might be mad at him because of an incident at a party involving another woman.

*Defense Evidence*

1. *Appellant*

Appellant testified on his own behalf. He had been married to Carmen for 33 years, and they had three sons, Ricardo, Carlos and Juan. He never touched his granddaughters

Jane Doe No. 1 or Jane Doe No. 2 in a sexual manner, and was never alone in a bedroom with either one. Ricardo told appellant about Jane Doe No. 1's allegations in May 2009. Appellant found out about Jane Doe No. 2's allegations in May 2010 when the police came to his home.

Appellant did not see Jane Doe No. 1 often, but he did sometimes pick her up for her visits with Ricardo. He saw Jane Doe No. 2 regularly after she was seven years old. Once during 2009 the girls visited at the same time.

On one visit in January 2008, appellant walked into a room when Jane Doe No. 1 was using a computer, and she quickly shut down the screen as he came in. He found a piece of paper with the website www.sexboyandgirl.com written on it under the mouse after she left the room. Appellant made Jane Doe No. 1 pull up the site for him and saw that it was sexual in nature. He told Martha about it. Appellant asked Jane Doe No. 1 about the site, and she was afraid to tell him who had given her the information, but said her mother knew about it. She asked appellant not to tell Ricardo. Later that month, appellant was at Martha's house waiting to pick up Jane Doe No. 1 for a visit. Martha's nephew, a bald man in his early 20's, wearing baggy clothing, arrived. Jane Doe No. 1 ran to him, called him "uncle" and gave him a hug. Martha became upset and forcibly separated them. She told Jane Doe No. 1 the man was not her uncle, and the man and Jane Doe No. 1 looked at one another and laughed. Later in the car with appellant, Jane Doe No. 1 told him the man was the one who had given her the website address, and that Martha knew about it but appellant could not say anything because the man was dangerous. Appellant agreed to remain quiet about Jane Doe No. 1's relationship and interactions with the man. On another visit during a party, appellant left an unwanted beer by his bed. Jane Doe No. 1 drank some beer, and told appellant she had been given beer and offered cigarettes at home by the man who gave her the website address.

One day, during a visit to his home in Diamond Bar, Jane Doe No. 2 whispered in appellant's ear, "Do whatever you want to me." He asked her what she meant. She told him she had seen her mom and her father's best friend having sex in her parents' bedroom, and heard her mother say that to the man.

Carmen testified that appellant was an excellent husband, father and grandfather, and she had no doubts about his character.

Carmen had got along well with Paula when she and Carlos were first married, but later found Paula to be a bad, dishonest person. Carmen described Jane Doe No. 2 as smart, vivacious and very affectionate with both Carmen and appellant. After Carlos and his family moved to California, Jane Doe No. 2 visited regularly. Jane Doe No. 2 was affectionate with appellant, and spent lots of time playing with him. But the two of them were never alone together. Paula always asked Carmen to take care of her children, but Carmen refused. The last time Paula asked Carmen to watch her kids was two weeks before Paula filed the police report against appellant.

Carmen said that Jane Doe No. 1 and Jane Doe No. 2 were together at their grandparents' apartment three or four times. Appellant was never alone with either girl. One of Jane Doe No. 2's parents was always there when she visited her grandparents. Neither girl ever slept in a bed with Carmen and appellant. The girls only watched TV in the living room.

Carmen did not see Jane Doe No. 1 as often as she saw Jane Doe No. 2, but sometimes she and appellant picked her up for visits with Ricardo. They took her places and spent time with her until Ricardo arrived. After Martha and Ricardo divorced, Carmen spoke only a few times to Martha. Martha said "ugly things" about Ricardo.

Sarah M. was married to Juan. Sarah described appellant as a good grandfather who spent time and played with all his grandkids, including Jane Doe No. 1 and Jane Doe No. 2. Sarah often saw Paula at the Pomona apartment with Jane Doe No. 2, even after she and Carlos separated. Sarah never saw anyone go into the master bedroom; everyone was always together at the home.

Sarah testified that appellant and Carmen went everywhere together and relied heavily on one another. Carmen did not drive, and relied on appellant to take her places. Beginning in February 2008 until April 2011, Carmen regularly spent her daytime hours at

Sarah's home in Burbank, where she helped care for Sarah's children. Appellant dropped her off on his way to work.

During the preliminary hearing, Sarah confronted Paula and Jane Doe No. 2 in the court hallway. She yelled at Paula, calling her a "fucking liar," and told Jane Doe No. 2 her mother was a liar. That incident resulted in a misdemeanor conviction for Sarah.

### 3. *Monica Hosozawa*

Monica Hosozawa worked with Ricardo and Carlos. Paula had thought Hosozawa and Carlos were having an affair, and frequently called Hosozawa and sent her text messages. Hosozawa hung up. Paula told Hosozawa that she had a plan to retaliate against Carlos. In late April and early May 2010, Paula called Hosozawa repeatedly. Paula was upset that Carlos took his daughters to parties at which there were women with whom Paula believed Carlos had had affairs. Paula told Hosozawa she and Martha had met and discussed Jane Doe No. 1's accusations of sexual abuse by appellant, and Paula said he had also molested Jane Doe No. 2. Paula asked Hosozawa for advice about what to do.

## DISCUSSION

*1. Appellant forfeited his right to complain that the trial court erred when it permitted the prosecution to amend the information.*

After the prosecutor rested, she made an oral request to amend the information to conform to the testimony at trial. The prosecutor said she initially charged counts 1 and 2 based on the acts occurring at specific times when Jane Doe No. 1 was in the second and third grades, as she had testified at the preliminary hearing. But at trial Jane Doe No. 1 testified she could not recall specific dates and said the acts had generally occurred when she was in those grades and after appellant lived in the Diamond Bar home with Ricardo.

Based on this testimony, the prosecution requested that count 1 be dismissed and that the date range therein be included in an extended date range for count 2 (continuous sexual

abuse). Defense counsel did not object, and the trial court granted the proposed amendment, dismissing count 1 and interlineating count 2.**3**

With respect to counts 3 and 4, the prosecutor requested that the dates be amended to distinguish an act committed from the time Jane Doe No. 2 moved to California in November 2008, through her first disclosure of the sexual abuse to her parents around July 2009, and an act committed after that disclosure until the disclosure to the police in May 2010. In other words, the prosecution requested: (1) to extend the date range alleged in count 3 by seven months (changing the ending date from December 24, 2008 to July 31, 2009), and (2) to push the start date for count 4 back five months (from January 1, 2010 to August 1, 2009; again, appellant's counsel did not object. The court agreed and made the requested amendments.

After the verdict, appellant retained new counsel who filed a motion for a new trial, arguing that the court erred in allowing the belated amendments. The motion was denied.

---

**3** The court stated: "Having heard the evidence in this case and having reviewed the case law which indicates I have very broad discretion, I don't think it's unfair to the defense to make the change [the prosecutor] is requesting. One count disappeared, so that's a benefit to [appellant]."

Appellant's counsel agreed.

Additionally, the court observed: "the defense, in this case, is not an alibi or lack of opportunity. The testimony throughout this trial has been that [appellant] had access to the children. He's not denying it in his testimony. None of the . . . witnesses have indicated there was not reoccurring access to the children. It's not an alibi or lack of opportunity defense. It's simply the children are making this up and it did not happen. I don't think there's any unfair prejudice . . . because it doesn't change the defense. I don't believe it would change your cross-examination of any witness and seems to conform to proof at this point. It is merely bringing the information in line with the evidence that's actually been presented at trial without any prejudice or down side to [appellant], that's my general feeling on this. Do you [defense] wish to be heard?"

Appellant's counsel had no comment.

Appellant maintains he was denied due process when the court permitted the prosecution to amend the information to conform to proof during trial because he was denied notice and an opportunity to prepare a defense.

Due process requires that a criminal defendant be advised of the charges against him so that he has a reasonable opportunity to prepare and present a defense and not be taken by surprise by evidence offered against him at trial. (*People v. Jo*nes (1990) 51 Cal.3d 294, 317 (*Jones*); accord, *People v. Seaton* (2001) 26 Cal.4th 598, 640–641.) But a defendant's due process rights are not prejudiced by amendment of the information, and the trial court may permit amendment of the accusatory pleading "at any stage of the proceeding, up to and including the close of trial," so long as defendant's substantial rights are not prejudiced. (*People v. Graff* (2009) 170 Cal.App.4th 345, 361.) An indictment, however, "cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." (§ 1009; *People v. Winters* (1990) 221 Cal.App.3d 997, 1003.)

Numerous procedures afford criminal defendants the means to obtain notice of the charges against them. They include, among others, the information, the preliminary examination and pretrial discovery. (*Jones*, *supra*, 51 Cal.3d at pp. 317–318.) Because of the availability of these procedures, the California Supreme Court has found that "prosecution of child molestation charges based on generic testimony does not, of itself, result in a denial of a defendant's due process right to fair notice of the charges against him." (*Id*. at p. 318.) In cases involving sexual molestation of children, the function of the accusatory pleading is to give notice to the defendant of the nature of the offense charged and whether it occurred within the applicable limitations period. "'[A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.'" (*Id*. at p. 317.)

Appellant appropriately concedes that he failed to object at trial to the proposed amendment of the information at trial. Accordingly, he forfeited his right to complain about the amendment of the information. (*People v. Scott* (1994) 9 Cal.4th 331, 354 [generally,

"only those claims properly raised and preserved by the parties are reviewable on appeal"].)
This claim has not been preserved for appellate review.

2.      *There was no instructional error.*

a.      *CALCRIM No. 3501*

After discussing the standard and modified unanimity instructions with counsel, the trial court instructed the jury with the modified instruction, CALCRIM No. 3501, rather than CALCRIM No. 3500. Appellant's counsel took no position as to which instruction should be given, and acquiesced without objection. On appeal, however, as he did in his posttrial motion, appellant contends the court erred when it gave CALCRIM No. 3501, rather than the standard unanimity instruction. Although appellant failed to object during trial to the instruction given, we address the merits of his contention.

"In a criminal case, a jury verdict must be unanimous. [Citations.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "Additionally, the jury must agree unanimously the defendant is guilty of a specific crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*Ibid.*, italics omitted)

"In a case in which the evidence indicates the jurors might disagree as to the particular act defendant committed, the standard unanimity instruction [e.g. CALCRIM No. 3500] should be given. [Citation.] But when there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction [e.g. CALCRIM 3501] which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim." (*Jones*, *supra*, 51 Cal.3d at pp. 321–322.)

Here, the trial court instructed the jury pursuant to CALCRIM No. 3501 as follows:

"The defendant is charged with lewd and lascivious act upon a child under the age of 14 in Counts 3 and 4, Count 3 alleges that the act occurred sometime during the period of

November 1, 2008 to July 31, 2009. Count 4 alleges that the act occurred sometime during the period of August 1, 2009 to May 15, 2010.

"The People have presented evidence of more than one act to prove that the defendant committed these offenses. You must not find the defendant guilty unless:

"1. You all agree that the People have proved that the defendant committed at least one of these acts during the relevant time period and you all agree on which act he committed for each offense;

"OR

"2. You all agree that the People have proved that the defendant committed all the acts alleged to have occurred during the relevant time period and have proved that the defendant committed at least the number of offenses charged."

CALCRIM No. 3501 is an alternative instruction to, CALCRIM No. 3500. CALCRIM No. 3501 affords two different approaches for the jury to reach the required unanimity. The first is the same as that set forth in CALCRIM No. 3500: agreement as to the acts constituting each offense. But unanimity may also be found under CALCRIM No. 3501 if the jury agrees "that the People have proved that the defendant committed all the acts alleged to have occurred during this time period [and have proved the defendant committed at least the number of offenses charged]."

The unanimity rule has been refined in cases involving sexual molestation of children and repeated identical offenses. "In such cases, although the jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described. "[E]ven generic testimony describes a repeated series of *specific*, though indistinguishable, acts of molestation. [Citation.] The unanimity instruction assists infocusing the jury's attention on each such act related by the victim and charged by the People. We see no constitutional impediment to allowing a jury, so instructed, to find a defendant guilty of more than one indistinguishable act, providing . . . three minimum prerequisites . . . are satisfied." (*Jones*, *supra*, 51 Cal.3d at p. 321.) Those prerequisites include generic evidence describing (1) the kind of acts committed, (2) the number of acts committed with sufficient certainty to support the alleged

15

counts, and (3) the general time period in which the acts occurred. (*Id.* at p. 316; *People v. Matute* (2002) 103 Cal.App.4th 1437, 1448.)

Jane Doe No. 2 testified about both specific and generic instances of molestation. Specific instances of touching by appellant included one occasion while Carmen was cooking dinner. Another took place on an evening when Jane Doe No. 2 and Paula spent the night at appellant's home. Paula set up a blanket on the floor for them to sleep on and went out, leaving Jane Doe No. 2 with her grandparents. Appellant joined Jane Doe No. 2 on the blanket and rubbed his hand in a circular motion "in [her] private part,]" her "bottom." A third incident of abuse took place when Jane Doe No. 2 slept with her grandparents in Ricardo's bed, and appellant touched her when Carmen left the bed to use the bathroom. Jane Doe No. 2 also described a specific incident when she was lying on her grandparents' bed in appellant's apartment, and he pulled her pants and panties down and began "kissing [her] on [her] private part," and refused to stop even after she told him three times to do so and pushed his head away. But, even as to her more specific descriptions of most of these acts, Jane Doe No. 2 was unable to provide much detail, or any dates when the abuse occurred or to enumerate how many times the touching happened. She also testified more generically about repeated, indistinguishable acts of molestation by appellant; e.g., his having touched her "bottom," when she visited his apartment "most times" or "two times a day." And, contrary to appellant's assertion, the record does not reflect that Jane Doe No. 2 testified that the specific events she recalled occurred only before her first disclosure of the abuse to her parents in May 2009. She did not state when all the specific acts she described happened in relation to that disclosure. Rather, she testified that they occurred both before and after her initial disclosure.

Both girls testified about numerous, repetitive molestations which took place over a defined period of time. Each described the distinct types of abuse to which she had been subjected in sufficient detail, was able to identify the locations where it took place, and was able to give a general estimate of the frequency of events. Appellant offered no evidence in his defense that might focus doubt as to any specific act of abuse as distinguished from any other act of molestation. Rather, his defense was simply that no molestation ever occurred.

16

Thus, it is unlikely that the jury would have a reasonable disagreement with respect to any particular act or instance of abuse, or could reasonably conclude that some of the victims' testimony was true but other parts were not.

The jurors either believed all the acts occurred, or they disbelieved the girls' stories completely. As *Jones* explains, if it is not reasonably likely that jurors will disagree as to which particular act the defendant committed and the only issue is whether they were committed at all, the jury should be given the modified unanimity instruction contained in CALCRIM No. 3501. This is so because the instruction allows the jurors to convict if they agree unanimously on certain acts or if they unanimously agree the defendant committed all the acts alleged by the victim. (*Jones*, *supra*, 51 Cal.3d at pp. 321–322.) The jury was properly instructed with CALCRIM No. 3501.

      *b.*     *CALCRIM No. 330.*

Appellant also contends that his state and federal constitutional rights to a jury trial, confrontation and due process were violated because the jury was improperly instructed with CALCRIM No. 330. He is wrong.

In accordance with CALCRIM No. 330, the jury was instructed:

"You have heard evidence from a child who is age ten or younger. As with any other witness, you must decide whether the child gave truthful and accurate testimony.

"In evaluating the child's testimony, you should consider all of the factors surrounding that testimony, including the child's age and level of cognitive development.

"When you evaluate child's cognitive development, consider the child's ability to perceive, understand, remember and communicate.

"While a child and adult witness may behave differently, that difference does not mean that one is any more or less believable than the other. You should not discount or distrust the testimony of a witness just because he or she is a child."

Defendant maintains this instruction should not have been given because it "invaded the jury's province" and unfairly bolstered Jane Doe No. 2's credibility, and violated his "constitutional right to present a defense and to confront Jane 2's testimony against him by

unfairly impairing his ability to impeach her credibility based on her inability to perceive, understand, remember, and communicate."

Anticipating our concerns, appellant acknowledges that he failed to object to the instruction at trial, but argues he has not forfeited the issue on appeal because the erroneous instruction affected his substantial rights. (§ 1259.) We find that appellant forfeited the issue. Failure to object below to an instruction correct in the law forfeits the claim on appeal. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) Nevertheless, exercising our discretion to address the merits, we conclude CALCRIM No. 330 is legally proper and the court acted appropriately in so instructing the jury.

Appellant maintains that, by instructing on CALCRIM No. 330, the trial court unfairly and unconstitutionally restricted the jury's consideration of evidence affecting the credibility of Jane Doe No. 2 who was nine when she testified.

Appellant concedes that his contentions have been uniformly rejected in published decisions rejecting the same argument with respect to CALJIC No. 2.20.1, the predecessor to CALCRIM No. 330. (*People v. McCoy* (2005) 133 Cal.App.4th 974, 979–980; *People v. Harlan* (1990) 222 Cal.App.3d 439, 455–457; *People v. Jones* (1992) 10 Cal.App.4th 1566, 1572–1574; *People v. Gilbert* (1992) 5 Cal.App.4th 1372, 1393.)

*People v. McCoy*, *supra*, 133 Cal.App.4th 974 summarized its predecessor cases: *People v. Harlan*, *supra*, 222 Cal.App.3d 439 "held that the instruction neither excessively inflates a child's testimony nor impermissibly usurps the jury's role as arbiter of witness credibility nor violates the accused's right to confront a child witness nor 'require[s] the jury to draw any particular inferences from a child's cognitive ability, age and performance as a witness. Rather, it instructs the jury to consider such factors in evaluating a child's testimony.' [Citation.] In . . . *People v Jones*[, *supra*,] 10 Cal.App.4th 1566, the court held that the instruction 'presupposes that the jury must make a determination of credibility, but only after considering all the factors related to a child's testimony, including his [or her] demeanor, i.e., how he or she testifies on the stand,' all without "'foreclos[ing] independent jury consideration of the credibility of a child witness."' [Citation.] [*People v. Gilbert*, *supra*, 5 Cal.App.4th 1372] held that CALJIC No. 2.20.1 neither "'lessen[s] the

government's burden of proof" nor "'instructs the jury to unduly inflate the testimony of a child witness'" [citation]:  The instruction tells the jury not to make its credibility determinations solely on the basis of the child's "age and level of cognitive development," but at the same time invites the jury to take these and all other factors surrounding the child's testimony into account.  The instruction provides sound and rational guidance to the jury in assessing the credibility of a class of witnesses as to whom "'traditional assumptions'" may previously have biased the factfinding process.  Obviously a criminal defendant is entitled to fairness, but just as obviously he or she cannot complain of an instruction the necessary effect of which is to increase the likelihood of a fair result.'  [Citation.]"  (*McCoy*, at p. 979.)

These holdings apply with equal force to CALCRIM No. 330, for the reasons explained in *McCoy*.  CALCRIM No. 330 simply instructs the jury to take into account a child's ability to perceive, understand, remember and communicate when making a credibility determination.  It does not instruct the jury to subject a child's testimony to a less rigorous credibility determination, nor does it excessively inflate a child witness's credibility.  We reject appellant's constitutional challenge to CALCRIM No. 330.[4]

3.      *Appellant's assertions of prosecutorial misconduct fail.*

Appellant contends the prosecutor committed misconduct during her closing argument, going "beyond the pale in attacking the character of the girls' fathers, grandmother, and appellant himself, while vouching for the credibility and character of the complaining witnesses and their mothers."  He also argues that the prosecutor sandbagged him by "sav[ing] most of the venom for her rebuttal closing, giving appellant no opportunity to respond to a vicious and misleading recitation of the evidence."  He also claims his trial counsel was ineffective for failing to object, and that the result of these errors cannot be deemed harmless.  None of appellant's contentions has merit.

---

[4] Our determination that no error occurred with regard to the trial court's decision to give either CALCRIM Nos.1305 or 330 renders it unnecessary to address appellant's contention that the court erred cumulatively by giving both.

### a.  *Forfeiture*

Appellant asserts that the prosecutor committed misconduct by statements she made in her closing argument.  In response, the Attorney General argues that by objecting only one time each on the vague ground of "improper argument" during the prosecutor's initial and rebuttal closing arguments, appellant has forfeited this issue.[5]  Appellant, who never requested an admonition, appropriately concedes the merits of this argument.

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct" (*People v. Price* (1991) 1 Cal.4th 324, 447), or if "an objection would have been futile" (*People v. Arias* (1996) 13 Cal.4th 92, 159).  Appellant did not object to the arguments he challenges on appeal.  He does not argue that it would have been futile for him to have done so, nor does he maintain that a judicial admonition could not have cured any error.  The issue of prosecutorial misconduct has been forfeited.  (*People v. Dennis* (1998) 17 Cal.4th 468, 521–522; *People v. Hill* (1998) 17 Cal.4th 800, 820 (*Hill*).)

### b.  *No prosecutorial misconduct*

Even on the merits the result would not change; there was no misconduct.

Appellant first argues that the prosecutor improperly vouched for the girls' credibility. A "prosecutor is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.]  Nor is a prosecutor permitted to place the prestige of her office behind a witness by offering the impression that she has taken steps to assure a witness's truthfulness at trial. [Citation.]  However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences

---

[5] Appellant's counsel objected as "improper argument" to the prosecutor's comments during her opening argument about how frightening it must have been for the children to testify.  She also objected that the prosecutor had "misstate[d] . . . testimony" in her rebuttal.  Both objections were overruled.

reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." (*People v. Frye* (1998) 18 Cal.4th 894, 971, disapproved on another point by *People v. Doolin* (2009) 45 Cal.4th 390, 421 & fn. 22; (*People v. Boyette* (2002) 29 Cal.4th 381, 433.) Misconduct arises only if, in arguing the veracity of a witness, the prosecutor implies she has evidence about which the jury is unaware. (*People v. Padilla* (1995) 11 Cal.4th 891, 945–946, overruled on another point in *Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.)

Here, the prosecutor's comments were grounded in the evidence regarding the victims and their families, or were reasonable inferences drawn from that evidence, especially relating to the girls' tenacity in sticking to their individual stories over the course of time and in the face of overt hostility aimed at them and their mothers from their paternal relatives. Because the prosecutor's comments were based on the evidence and reasonable inferences that could be drawn therefrom, they were not improper vouching. (*Boyette*, *supra*, 29 Cal.4th at p. 433.)

Appellant also takes issue with the prosecutor's "attacks on the character of the girls' fathers and grandmother and appellant himself." He argues that the prosecutor repeatedly labeled him and his family members liars. This was a permissible argument. "'The prosecutor is permitted to urge, in colorful terms, that defense witnesses are not entitled to credence . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated . . . .' [Citation]." (*Boyette*, *supra*, 29 Cal.4th at p. 433.) The evidence was conflicting concerning those issues the prosecutor argued appellant and his family lied about (e.g., whether appellant was ever alone with either granddaughter, Ricardo's attentiveness— or lack thereof—to his daughter during visits, when Carlos learned that his niece had been molested, the brothers' financial dependence on their father.) From this evidence, the prosecutor was permitted to argue that appellant was less than truthful. "'[H]arsh and colorful attacks on the credibility of opposing witnesses . . . are permissible. [Citations.]'" (*People v. Pearson* (2013) 56 Cal.4th 393.) As with most child molestation cases, this entire case hinged on who was lying and who was telling the truth. It is not surprising, therefore,

that the entire argument of both defense counsel and the prosecution consisted of a series of attacks on the credibility and character of witnesses.

The prosecutor made no direct personal attacks on appellant or any defense witness. But, the prosecutor's comments did address testimony by appellant and defense witnesses that implied the girls' mothers concocted the allegations of molestation in order to retaliate against their ex-husbands, and had exposed or allowed their daughters to be exposed to sexual or pornographic material. The prosecutor also commented on the defense witnesses' many contradictions of one another, and on Ricardo's frequently internally inconsistent testimony, particularly his attempts to portray himself as a vigilant, attentive father when Jane Doe No. 1 visited him at appellant's home, when in fact Ricardo regularly just dropped his daughter off and left. Finally, in response to appellant's closing argument, the prosecutor argues that appellant's grown sons—the victims' fathers—had a motive to lie on his behalf, because both were financially dependent on him. Sarah also had a motive to lie, because she continually relied on Carmen (who in turn relied on appellant to drive her places) to care for her children. Nothing the prosecutor said was an improper appeal to the jurors' emotions nor was it aimed at inflaming their passions.

Even if we stretched to label the prosecutor's argument as "harsh," or "colorful," it was not improper. (*Pearson*, *supra*, 56 Cal.4th at p. 442.) "[T]he use of derogatory epithets to describe a defendant is not necessarily misconduct." (*People v. Friend* (2009) 47 Cal.4th 1, 32 [defendant described as "'living like a mole or the rat that he is'"].) "A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251.) The California Supreme Court has repeatedly rejected claims of prosecutorial misconduct involving the use of such epithets in guilt phase arguments. (See, e.g., *People v. Young* (2005) 34 Cal.4th 1149, 1195 [no misconduct where prosecutor characterized crimes as "'serial killing,'" and "'terrorizing and killing'" people, italics omitted]; *Pensinger*, at pp. 1250–1251 [no misconduct where prosecutor referred to defendant as a "'perverted maniac'"].) The far milder aspersions cast on appellant and his family members by the

prosecutor here were isolated characterizations in the course of her summation, not misconduct.**6**

Appellant also complains that he was sandbagged because the prosecutor saved her most venomous attack for her rebuttal argument, giving him no opportunity to respond. He likens this case to *People v. Robinson* (1995) 31 Cal.App.4th 494, where the court found the prosecutor committed misconduct by giving a "perfunctory (three and one-half reporter transcript pages) opening argument designed to preclude effective defense reply," followed by a "'rebuttal'" argument that was "10 times longer (35 reporter transcript pages) than his opening argument." (*Id*. at p. 505.) Here, however, the prosecutor's opening argument (20 transcript page) was not perfunctory, and her rebuttal was six pages shorter—not 10 times as long—as the opening part of her closing argument. Moreover, the vast majority of the prosecution rebuttal was a fair response to the theory posed in appellant's closing argument that the girls were merely acting out in order to garner whatever attention they could from their fathers and other members of their dysfunctional family. On this record, it cannot be said that the prosecutor's conduct was so egregious that it infected the trial making it fundamentally unfair, or that the prosecutor used any deceptive or reprehensible methods.

---

**6** We also reject appellant's unsubstantiated assertion that the prosecutor "impugned . . . the defense team."

A prosecutor is not "required to discuss his [or her] view of the case in clinical or detached detail." (*People v. Panah* (2005) 35 Cal.4th 395, 463.) He or she may make comments "aimed solely at the persuasive force of defense counsel's closing argument, [but] . . . not at counsel personally. . . . [Citations.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1155, disapproved on a different point by *People v. Doolin*, *supra*, 45 Cal.4th at p. 421 & fn. 22.) Appellant points to no comment by the prosecutor, nor has our review disclosed any, that rises to the level of misconduct under either federal or state standards. Viewed in context, none of her comments were personal attacks on defense counsel, but were instead a fair rebuttal to doubts the defense tried to cast on the victims' credibility. The prosecutor's remarks related to the evidence in the case and urged the jurors not to be distracted by defense counsel's focus on the dynamics of the victims' dysfunctional extended family. (See *People v. Cunningham* (2001) 25 Cal.4th 926, 1002–1003 [no reasonable likelihood jury improperly influenced by prosecutor's remarks that defense counsel's "'job is to create straw men. . . . put up smoke, red herrings'"].)

23

On this record, the prosecutor's remarks were permissible rebuttal on the pivotal issue of witness credibility. (See *People v. Tully* (2012) 54 Cal.4th 952, 1016; *People v. Stanley* (2006) 39 Cal.4th 913, 952.) Appellant's claim of prosecutorial misconduct fails.

   c.    *Harmless error*

Assuming (which we do only for the purpose of this analysis) that the prosecutor's argument was improper, it is clear to us from our review of the record that the argument was harmless, and that no prejudice has been (or can be) demonstrated. Even where a defendant shows prosecutorial misconduct occurred, reversal is not required unless the defendant can show he suffered prejudice. (*People v. Arias*, *supra*, 13 Cal.4th at p. 161.) Error with respect to prosecutorial misconduct is evaluated under *Chapman v. California* (1967) 386 U.S. 18 [87 S.Ct. 824, 17 L.Ed.2d 705], to the extent federal constitutional rights are implicated, and *People v. Watson* (1956) 46 Cal.2d 818, if only state law issues were involved. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 514.) *Chapman* is implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214–1216; *People v. Harris* (1989) 47 Cal.3d 1047, 1084.) *Watson* applies where the prosecutor uses "'"'"deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"'"'" (*Gionis*, at p. 1215.)

We find that, even if the prosecutor's argument constituted misconduct, it did not render the trial so fundamentally unfair that it triggered the *Chapman* standard. Nor is it reasonably probable that a more favorable result would have been reached absent the alleged objectionable argument. Reversal is neither warranted nor appropriate. (*People v. Watson*, *supra*, 46 Cal.2d at 836; *People v. Barnett* (1998) 17 Cal.4th 1044, 1133.) As the jury heard, appellant's granddaughters testified credibly and presented powerful evidence against him. It is not reasonably probable that appellant would have achieved a more favorable outcome had the prosecutor not made her allegedly improper argument.

   d.    *Ineffective assistance of counsel*

Finally, we turn to appellant's claims of ineffective assistance of counsel. He asserts in a conclusory manner that his trial counsel was ineffective for failing to object to the trial

court's amendment of the information, the prosecutor's allegedly improper argument, and sandbagging tactics in her closing argument. However, as we concluded above, the court's amendment of the information was not error and there was no misconduct by the prosecutor. Thus, we also conclude on this record that appellant's trial counsel was not ineffective for failing to object, because there was a tactical reason for not doing so. In short, there was no error. (See *People v. Lucas* (1995) 12 Cal.4th 415, 436–443; *People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007–1008 [on direct appeal "a conviction will be reversed for ineffective assistance of counsel only when the record demonstrates there could have been no rational tactical purpose for counsel's challenged act or omission"].)

This was an emotionally-charged case involving two young girls and their volatile family. The closing argument (including rebuttal) was relatively short and focused, by necessity, primarily on the credibility of the victims vis-à-vis that of appellant, the girls' fathers and other members of appellant's family. The prosecutor commented, but did not dwell, on objectionable material. Defense counsel reasonably could have concluded that she did not want to draw additional attention to those statements by objecting, having the court rule on the objections, striking them, and having the court give an admonition. Because this would have been a reasonable trial strategy, we cannot find defense counsel's performance deficient. Appellant's claim of ineffective assistance of counsel as to prosecutorial misconduct lacks merit. (*People v. Adanandus* (2007) 157 Cal.App.4th 496, 515–516.)

*4.      Reversal is not required because defense counsel did not present a <u>Stoll</u> expert at trial.*

Appellant argues he was denied effective assistance of counsel because his trial attorney declined to call an expert under *People v. Stoll* (1989) 49 Cal.3d 1136 (*Stoll*).

*a.      Procedural background*

On April 13, 2011, during jury selection, defense counsel informed the court she had neglected to add Dr. Cherkis, an expert, to her witness list. Counsel had not previously notified the prosecutor about this witness—whom she was not yet sure she wished to call— and did not have his report, but expected it by the next day.

On April 18, 2011, defense counsel still had not given the court or prosecutor a copy of Dr. Cherkis's report. She informed the court that Dr. Cherkis had met with appellant on April 16, 2011, and that she expected his report that day. When reminded that she was supposed to have provided notice that Dr. Cherkis would testify 30 days prior to trial, appellant's attorney said she thought her office had taken care of it.

Later that day, defense counsel told the court that Dr. Cherkis's report was being faxed to the court, but the report did not promptly arrive and the court informed appellant's counsel she needed to get the report that night.

On April 19, 2011, the court informed the parties that it had received and reviewed Dr. Cherkis's one and a half page report the day before. Appellant's counsel informed the court that the report was "inadequate for testimony," and said she no longer planned to call Cherkis as a witness.

In a motion for a new trial, appellant argued that his trial counsel was ineffective, in part, for failing to present a *Stoll* expert. After the conviction, appellant's new defense counsel had a *Stoll* evaluation conducted by a psychologist, Dr. Malinek, who said he "doubt[ed] [appellant] is a pedophile, . . . since pedophiles typically show sexually inappropriate interest in children much earlier in life," and appellant was 51 with no prior history of sexual misconduct. Malinek also said that "all the criminological risk factors, which have been associated with recidivism among sex offenders, are absent in this case." Further, appellant's scores on two "state of the art" actuarial tools used to assess the risk of recidivism, were "unusually low, . . . suggesting a very low recidivism risk." Appellant argued that this expert testimony would have created a reasonable doubt as to his guilt.

The trial court denied the motion for a new trial. As to this argument, the court said:

"Insofar as the failure to call Dr. Cherkis as a [*Stoll*] expert or somebody else as a [*Stoll*] expert, again, I don't think the defense has established that there was not a tacti[cal] reason for not doing that. I think it could be for any number of reasons. Many lawyers feel that jurors don't take kindly to expert testimony in the psychological area. I don't think there's necessarily . . . no tactical reason why she might not want to call a defense expert in that area. I don't think that fact considered either individually or cumulatively with any other

allegation would have reasonably or likely changed the outcome of the trial. So I find any tactical error or inadequate performance by [trial counsel was harmless], and I'm not finding that because I don't think the defense has established it [error], but even if somebody were to disagree with me and reach that conclusion, I don't find it to have been material to the outcome of the case. I don't think reasonably and likely that a different outcome would have been reached had such an expert . . . testified."

Appellant insists that, had his trial attorney been effective and obtained a *Stoll* examination, he would have been able to show the jury that his psychological makeup is not consonant with molesting a child, and that this case presented indicia of a credible claim of innocence requiring reversal.

"It is now settled that psychological opinions based upon personal examination and an analysis of accepted psychological tests . . . may be admitted as character evidence tending to show that an individual was or was not likely to have committed a particular act." (*People v. Ruiz* (1990) 222 Cal.App.3d 1241, 1243–1244, *Stoll*, *supra*, 49 Cal.3d at p. 1153; Evid. Code, § 1102, subd. (a).) In *Stoll*, a child molestation case, the California Supreme Court held that the trial court erroneously excluded a psychiatrist's opinion that defendant had a "'normal personality function,'" that defendant had not previously engaged in "sexual deviancy of any kind" and that it was "'unlikely . . . she would be involved in the events she's been charged with.'" (*Stoll*, *supra*, 49 Cal.3d at p. 1149, italics omitted.)

Appellant's claim fails. While the case is close, he did not definitively establish that trial counsel lacked a tactical reason for declining to present a *Stoll* expert at trial. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 [104 S.Ct. 2052, 80 L.Ed.2d 674]; *People v. Lucas*, *supra*, 12 Cal.4th at pp. 436–437.) We agree with the trial court that it is possible that appellant's counsel decided a psychological expert might not hold sway with the jurors and chose not to present that testimony.

Even if we assume trial counsel was deficient in failing to present an expert, appellant cannot show that he suffered any prejudice as a result. Appellant maintained he did not molest either of his granddaughters, and claimed they made up the allegations in collusion with one another and their mothers to retaliate against his sons. But, despite the considerable

effort expended to establish this conspiracy, the defense never presented any evidence to show that Jane Doe No. 1 or Jane Doe No. 2 had any interactions that would have permitted them to have engaged in such concerted efforts, let alone that their mothers did so.

Further, most of the acts of molestation described by the girls differed between them. Jane Doe No. 1 testified about behavior by appellant that involved him frequently touching her vagina, inserting his finger into her vagina, and appellant's displaying of his penis to Jane Doe No. 1 and also asking her to touch it. The behaviors Jane Doe No. 2 described were different. They involved appellant frequently touching her "bottom," his oral copulation of her vagina and no exposure of his penis. In addition, both girls were reluctant to report appellant's actions to the police. The girls' testimony throughout the stages of the case regarding the sexual abuse was consistent and there was no evidence they had discussed appellant's conduct in advance.

In addition, the record reflects that Paula did not learn that Jane Doe No. 1 had been molested until she met with Martha in May 2010 to discuss an unrelated matter. That was a year after the abuse of Jane Doe No. 1 had been reported to the police, and about a year after Jane Doe No. 2 first told her own parents she had been molested. Only after she checked again with her daughter and learned appellant was still sexually abusing her did Paula and Jane Doe No. 2 also report the abuse to the police.

In *Stoll*, four defendants were jointly tried and convicted of 36 counts of lewd conduct against seven young boys. (*Stoll*, *supra*, 49 Cal.3d at p. 1141.) Two of the defendants, convicted on four and five counts, tried to present expert testimony that they displayed no signs of sexual deviance. (*Id*. at pp. 1141–1142.) In finding prejudice, *Stoll* emphasized that the defendants had "mounted a thorough attack on the credibility of each witness." (*Id*. at p. 1162.) In addition, four of the five victims admitted they lied at the preliminary hearing, two witnesses admitted to at least one untruth in their testimony at trial; and all five victims contradicted their pretrial statements in some respect. (*Ibid*.) Plus, one defendant had a partial alibi. (*Ibid*.)

*Stoll* resembles this case in that, as in most cases involving accusations of sexual molestation, there is no physical evidence or eyewitness testimony to corroborate the

allegations of abuse. But the two cases also differ markedly in that, here, the prosecution lacked the numerous and fatal flaws emphasized in the prejudice analysis in *Stoll*. The *Stoll* testimony proffered in the new trial motion, if believed, would tend to suggest appellant may not have committed the charged offenses. (*Stoll*, *supra*, 49 Cal.3d at p. 1161.) But, absent some significant impairment of the victims' credibility or evidence to support appellant's conspiracy theory, we cannot agree that there is a reasonable probability the *Stoll* evidence would have produced a different result on any count in this case. Appellant's claim of ineffective assistance fails.

5.      *Appellant has not shown cumulative error.*

Appellant's contends reversal of his convictions is required due to the cumulative effect of all the alleged errors. But we have rejected appellant's contentions on appeal. Accordingly, we also reject his claim of cumulative error. "There was . . . no error to cumulate." (*People v. Phillips* (2000) 22 Cal.4th 226, 244.) And, to the extent there was any error, appellant was not prejudiced thereby. (*People v. Jenkins* (2000) 22 Cal.4th 900, 1056 ["trial was not fundamentally unfair, even if we consider the cumulative impact of the few errors that occurred"]; accord, *People v. Sapp* (2003) 31 Cal.4th 240, 316.) Accordingly, reversal is not in order.

**DISPOSITION**

The judgment is affirmed.

CERTIFIED FOR PUBLICATION.


                                          JOHNSON, J.


We concur:


            ROTHSCHILD, Acting P. J.


            CHANEY, J.