Filed 7/1/15  P. v. Teate CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B259203 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA062991) |
| v. | |
| KEVIN L. TEATE, JR., | |
| Defendant and Appellant. | |

APPEAL from the judgment of the Superior Court of Los Angeles County. Charles A. Chung, Judge.  Affirmed.

———

Trenton C. Packer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Timothy M. Weiner and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

———

A jury convicted defendant Kevin Teate, Jr., of burglary and the trial court sentenced him to two years in prison. He contends that the prosecutor committed prejudicial misconduct during closing argument by arguing facts not in evidence to vouch for the credibility of a prosecution witness. We hold that Teate forfeited this argument by failing to object at trial and, in any event, the prosecutor's argument was not improper.

## FACTUAL SUMMARY

1. *Summary of Evidence at Trial*

On the morning of May 12, 2014, someone broke into Christina Maloney's house while she was away. Around 10:50 that morning, Paul Veronica observed a black woman at the front door of Maloney's house. The woman rang the doorbell for several minutes and appeared "very nervous," as if she was "afraid she was going to get caught." Eventually, the woman walked to a car parked nearby. Veronica then noticed two black males standing in a planter area near the back of Maloney's house "acting suspicious." They were "just standing there and . . . looking at the girl in the car." Veronica "just got a glimpse" of the men and could not identify them at trial.

Around the same time, neighbors Rogelio and Leslie Villegas drove by Maloney's house. From a distance of 20 or 30 feet Rogelio[1] observed two unfamiliar black males standing on the corner waving their hands, and a woman in a black car nearby.

A couple of minutes later, the Villegases drove past the same spot and Rogelio noticed that the two men were gone and the woman was still in the car. They became suspicious and called the police.

Rogelio made a U-turn and drove back to the corner. He then saw the two men on top of a low wall outside Maloney's house. One of them was wearing shorts and gloves, the other was wearing black and red pants. The man in shorts ran across the street, about 20 to 40 feet in front of the Villegases' car, and into the desert. The man wearing black and red pants ran to the black car and got in the front passenger seat. Rogelio did not get

---

[1] For clarity, and without intending any disrespect, we will refer to Rogelio and Leslie Villegas by their first names.

a "great look" at the man who ran into the desert; he "got a better look at" the man who ran to the car.

As the car drove away, it passed the Villegases, then turned off the road and into the desert. Leslie wrote down the car's license plate number. The Villegases watched as the car and the man in shorts headed toward each other.

Just then, the Villegases flagged down Los Angeles County Sheriff's Deputy Joshua Epstein and told him what they saw. Deputy Epstein saw a man in shorts walking eastbound toward a black car. He drove southbound on a dirt road toward the man and the car. The man in shorts then turned and walked northbound, away from the car and toward Deputy Epstein's patrol car; the black car started driving southbound.

Deputy Epstein drove past the man in shorts and followed the car. At the closest point, the deputy was 10 yards from the man in shorts.

He stopped the black car and detained the male passenger and the female driver. He was able to identify the male passenger as Tafari Williams, co-defendant. Williams was wearing dark pants.

The car's license plate matched Leslie's report and was registered in Williams's name. Deputy Epstein also found Teate's driver's license inside the car and recognized the person pictured on Teate's license as the man he had just passed, but by that time the man had disappeared.

The Villagases made in-field identifications of the man in the car. Rogelio identified the man as the person he saw running to and getting into the car. Leslie identified Williams as the person she saw get into the car "based on the fact that [she] followed the car" until the police stopped it.

The next day, at the Lancaster station jail, Deputy Epstein identified Teate as the man "in the black shorts that was walking in the desert that day."[2] He also identified him at the preliminary hearing and at trial.

---

[2] The circumstances surrounding Teate's apprehension are not disclosed in the record.

3

Teate and Williams were tried together before separate juries. Rogelio identified the defendants in court as the two men he saw on the street corner outside Maloney's house. Although he was "sure" the defendants were the two people he had seen, he was not certain which defendant got into the car and which ran into the desert. At one point, he testified that he was "pretty sure" Teate was the man who got into the passenger seat of the car, but he was "not a hundred percent" sure.

Leslie identified Williams in court as the man who ran into the desert, but said she could not be certain. She did not recognize Teate, but testified that Teate and Williams resembled the two men she saw outside Moleny's house based on their height, weight, and complexions.

Jeffrey Leonard testified in Teate's defense. He testified that he and defendant attended a dance appreciation class at Antelope Valley College that began at 9:00 in the morning on May 12, 2014. The class may have ended at any time between 9:30 a.m. and 11:00 a.m. After the class, he and Teate went to therapy for about 10 minutes and, at 2:00 in the afternoon, were together at football practice. At some point between therapy and football practice, Leonard saw Teate briefly at Leonard's apartment. During cross-examination, however, Leonard admitted that he did not know what days of the week the dance appreciation class met and was not sure of the date he saw Teate in the class.

2.    *The Prosecutor's Comments During Closing Argument.*

During his opening argument, the prosecutor stated the following: "[Defense counsel] will probably talk mostly about identity. There is quite a bit of facts in this case that lead to show that Mr. Teate was the person running through the desert that day. First and foremost you heard Deputy Epstein come in here, take an oath and testify to you that he saw Mr. Teate as the person who was initially walking through the desert and changed direction when the police car came into view. And as he drove past him, he had a clear, unobstructed view. Mr. Teate walked directly past the police car about ten yards away facing forward. A couple of things about that. [¶] Deputy Epstein—that's his job. That is what he does. He is a police officer. He encounters stressful situations on a

4

daily basis. He's trained for situations like that. That is what he is supposed to do."

The prosecutor then pointed out that the Villegases "identified both defendants but they were unsure as to who did what. . . . They weren't sure if [Mr.] Teate was the one running in the desert or the one getting in the car or whether Williams was the one in the desert or in the car. They weren't sure. And that's understandable. These people aren't trained. They don't deal with stressful situations on a daily basis."

The prosecutor continued, "the deputy, on the other hand, was right. Because things like that could cost him his life. If he is chasing a dangerous suspect, he needs to be able to recognize that person quickly, and that's what he does. He didn't make any mistakes. He was very clear that the person sitting in court here today, Mr. Teate, is the person walking in the desert from that home and changed directions as soon as the police car came into view. He was very clear about that."

In the defense closing argument, counsel placed some emphasis on the theory of "cross-racial misidentification." Regarding an instruction listing factors to consider in proving identity by eyewitness testimony, he stated: "The one I find important is cross-racial or the ethnic nature of the identification. That's when an eyewitness of one race is asked to identify a particular individual of another race or ethnicity. This is such a problem that it's contained in your jury instructions. . . . This is not a defense tactic to try to cloud the issue because there are definite cross-racial identification issues in this case." Counsel asserted that Deputy Epstein "is mistaken because of his biases."

In his rebuttal closing argument, the prosecutor responded: "[Defense counsel] talked about cross-racial I.D. of Deputy Epstein as to [Teate]. . . . [q]uite frankly, some people may be better at identifying people of a different race and some people may not be. It really depends on the individual. It depends on the person's experiences. . . . [Deputy Epstein] does deal with a large number of the public. Probably more than most people's jobs. Certainly more than people in an office. In that sense he probably does have more contact with people of different races, Caucasian, African American, Hispanic, Asian, than the average person just because a police officer deals with such a

5

large number of the public. If you look at it that way, he probably has a better position than most people, but, again, it's a very minor factor to consider."

Defendant did not object or seek a curative admonition as to any of the prosecutor's statements.

## DISCUSSION

Teate contends that the prosecutor's statements regarding Deputy Epstein's identification of Teate constituted prejudicial misconduct. In particular, he points to the prosecutor's statements that Deputy Epstein's identification was "right . . . [b]ecause things like that could cost him his life," and that the deputy has more contact with people from different races than the average person or "people in an office." The Attorney General argues that Teate has forfeited this claim and, if not forfeited, it lacks merit.

In general, a defendant who fails to object to a prosecutor's statements at trial and request a jury admonition has forfeited any claim concerning the statements on appeal. (See *People v. Gamache* (2010) 48 Cal.4th 347, 371.) This rule applies to cases in which the prosecutor is accused of vouching for the credibility of prosecution witnesses. (See, e.g., *People v. Redd* (2010) 48 Cal.4th 691, 741; *People v. Riggs* (2008) 44 Cal.4th 248, 302; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 561.)

Because Teate failed to assert an objection, he forfeited the argument that the comments constituted misconduct.

Teate relies on our decision in *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1586 (*Alvarado*), to support his misconduct claim as well as to counter the Attorney General's argument that the claim has been forfeited.

In *Alvarado*, the prosecutor began her rebuttal argument by stating: "'I have a duty and I have taken an oath as a deputy [d]istrict [a]ttorney not to prosecute a case if I have any doubt that that crime occurred. [¶] The defendant charged is the person who did it.'" (*Alvarado, supra,* 141 Cal.App.4th at p. 1581.) This, we concluded, "impermissibly invited the jury to convict Alvarado based on her opinion that he was guilty and on the prestige of her office." (*Id.* at p. 1585.) In addition, the prosecutor made numerous improper comments, such as vouching for the credibility of the sole eyewitness in the

6

case, suggesting there was additional, undisclosed evidence of the defendant's guilt, and pointing out the irrelevant and prejudicial fact that defendant was observed "'hanging out with his crack pipe.'" (*Id.* at pp. 1585-1586.) We concluded that, "[v]iewed in context, the challenged comments were so prejudicial that an admonition would not have dispelled the harm." (*Ibid.*)

We are guided by well-settled principles. "'''''A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."''''' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "'''''the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."''''' [Citation.]'" (*People v. Hill* (1998) 17 Cal.4th 800, 819.)

The prosecutor "is prohibited from vouching for the credibility of witnesses or otherwise bolstering the veracity of their testimony by referring to evidence outside the record. [Citations.] . . . However, so long as a prosecutor's assurances regarding the apparent honesty or reliability of prosecution witnesses are based on the 'facts of [the] record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' her comments cannot be characterized as improper vouching." (*People v. Frye* (1998) 18 Cal.4th 894, 971.)

Here, unlike *Alvarado*, the prosecutor's comments did not vouch for the officer. He merely described what would generally be a police officer's experience on the job.

7

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:


JOHNSON, J.


BENDIX, J.[*]

---

[*]     Judge of the Los Angeles Superior Court, Assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.