Filed 7/7/16  P. v. Vazquez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PERLA IBETH VAZQUEZ,<br><br>    Defendant and Appellant. | F069915<br><br>(Fresno Super. Ct. No. F11906122)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Paul A. Bernardino, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Perla Ibeth Vazquez was 25 years old and already had two prior convictions for driving under the influence of alcohol (DUI).  Her license had been suspended, and she had been advised that she could be charged with murder if someone

was killed as a result of her driving under the influence. Despite these warnings, defendant continued to drive while intoxicated and was repeatedly stopped for erratic driving.

On October 21, 2011, defendant was again driving without a license while intoxicated. She was traveling at a high rate of speed and crashed into the back of Frank Winslow's Jeep on the highway, which caused his vehicle to spin, flip over multiple times, and crash down an embankment. Winslow died at the scene from massive internal injuries. Defendant continued driving after the collision, even though her air bag had opened and her car was damaged. She was stopped a short distance away and her car was trailing debris. Her blood-alcohol content was 0.13 percent.

Defendant was charged and convicted of count I, second degree murder of Winslow (Pen. Code, § 187, subd. (a));[1] count II, leaving the scene of an accident which caused death (Veh. Code, § 20001, subds. (a), (b)(2)); and count III, misdemeanor driving with a license suspended for a DUI conviction (Veh. Code, § 14601.2, subd. (a)). She was sentenced to 15 years to life.

On appeal, defendant complains that even though the prosecutor originally charged her with both second degree murder and gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), he moved to dismiss the manslaughter charge on the first day of trial. Defendant asserts the court abused its discretion when it granted the motion and allowed the prosecutor to only go forward with the second degree murder charge. Defendant also contends the abstract of judgment must be amended.

We order amendment of the abstract of judgment and otherwise affirm.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

# FACTS

## Counts I through III

Around 3:00 a.m. on October 21, 2011, Frank Winslow (Winslow) was driving his white Jeep Wrangler on Highway 168 in Fresno. Winslow worked for Foster Farms as a truck driver. He had just finished his daily round trip between Fresno and Los Angeles and was driving home in his personal vehicle. Winslow and his wife had been married for 27 years, and they had two children.

Jean Souvanny (Souvanny) and her husband, Sim Sor (Sor), were driving behind Winslow's Jeep in the slow (number 3) lane. They did not know him. Souvanny believed both their cars were traveling at 65 miles per hour. The weather was cool and dry; visibility was good; there was no fog or rain; and the road was not slippery.

Souvanny testified she noticed headlights in her rear view mirror, which were from a car traveling at a faster rate of speed. The car was coming up behind her very fast. Souvanney told Sor that "all of a sudden" headlights were coming "from behind pretty quick." Sor turned around and saw two headlights from one car. Sor thought the car was going about 80 miles per hour, and it was catching up with them.

Souvanny was going to turn on the Shaw Avenue off-ramp. The Jeep remained in front of her in the slow lane. As Souvanny turned on the off-ramp, Souvanny and Sor suddenly heard a very loud crash from the left side of their car. Souvanny looked to her left and saw a black car pushing the Jeep. Sor also saw the black car. The Jeep flipped over and went down the embankment. Souvanny testified the black car stopped on the highway for a very short time, then continued on the freeway at a slow rate, toward the Bullard off-ramp.

Souvanny immediately pulled over and her husband called 911. Sor ran down the embankment to check on the Jeep's occupant. Sor testified the driver was still in his seat. He was leaning toward the passenger side, and his face was down. He was still

3.

breathing. Sor tried to talk to him, and said, " 'Hey, you okay,' " and " 'Hey, stay with me.' " After about 30 seconds, the driver stopped breathing.

### *The initial investigation*

At 3:25 a.m., law enforcement and emergency personnel responded to the scene. The officers found Winslow's Jeep in the culvert adjacent to the off-ramp. Sor was still standing next to it. Winslow was slumped over in the driver's seat, leaning toward the passenger side, and still wearing his seat belt. He had suffered massive head injuries and was pronounced dead at the scene.

The pathologist testified Winslow suffered extensive injuries and internal bleeding in his head, brain, and entire body. The cause of death was head, neck, and chest injuries as a result of very significant force from a motor vehicle collision. The head and neck injuries would have been fatal in a matter of seconds or minutes.

The damage to the Jeep was consistent with a total rollover. The tires were deflated, the doors and fenders were extensively damaged, and there was additional damage to the rear of the vehicle. There was a large debris field of glass, plastic, and fluids from the Jeep in the slow lane and the shoulder. There were tire abrasions, skid marks, and gouges in the roadway, which were also from the Jeep. The officers believed the Jeep overturned, skidded across the roadway, and rolled down the culvert.

### *Arrest of defendant*

Shortly after the fatal collision, Madera Police Officer Jason Green was riding his patrol motorcycle on Highway 168. He was off duty and heading home, and unaware of the fatal collision. He was near the Bullard off-ramp, just north of the collision scene, when he saw a black car traveling slowly on the shoulder. The black car was straddling the fog line and the hazard lights were on. There was a trail of vehicle debris and fluid behind the car, the front end was damaged, and smoke was coming from the engine.

Officer Green activated his siren and signal lights to conduct a traffic stop. The black car stopped about halfway down the Bullard off-ramp.

4.

Officer Green approached the driver's side window. Defendant was sitting in the driver's seat of her black 2004 Infiniti G35. The driver's side air bag was inflated, and she was trying to flatten it down. There was significant damage to the car. Green smelled an odor of an alcoholic beverage. Defendant's speech was slow, thick, and slurred, and he believed she had been drinking.

At 3:21 a.m., Officer Green contacted the California Highway Patrol (CHP) to report a possible DUI collision involving the black Infiniti. The dispatcher advised him to detain defendant because she was likely involved in the fatal collision.

Officer Green asked defendant to get out of her car and advised her that she was being detained. Defendant got out and had to hold onto her car to maintain her balance. Green placed her in handcuffs and they waited at the back of her car. Defendant asked Green "how long I thought this was gonna take," because she had to work the next day.

CHP Officer Fief arrived at Officer Green's location and took custody of defendant. Fief testified defendant's eyes were red and watery, and her speech was slurred, slow, and deliberate. Fief smelled the "strong and distinct odor of alcohol emitting from her breath and her person."

Officer Fief administered field sobriety tests (FSTs) to defendant. Defendant could not follow instructions and she lost her balance. Defendant swayed and stumbled, and Fief put out his arms to catch her. Fief testified her performance was consistent with someone who was impaired due to alcohol consumption.

Officer Fief advised defendant that someone had died as a result of the collision. Fief testified defendant did not cry, fall down, or show any remorse. Instead, defendant asked Fief "when she could go home because she was tired and she wanted to go to sleep before going to work."

Officer Fief concluded defendant had been driving under the influence and arrested her. He placed her in the back seat of his patrol car. Within a few moments, defendant passed out.

Defendant was 25 years old and driving on a suspended license because of prior DUI convictions. Defendant submitted to a blood test at 5:59 a.m., about two hours after the fatal collision. Her blood-alcohol level was 0.13 percent. An expert testified that a person of similar build to defendant would have required four 12-ounce alcoholic drinks to reach that concentration rate. The expert believed that based on calculations from absorption rates, her blood-alcohol level would have been between 0.17 and 0.18 percent at the time of the accident, the equivalent of four to five drinks.

### *Accident reconstruction*

A forensic examination of defendant's car revealed the brakes worked, and there were no preexisting mechanical problems that would have contributed to the collision. The engine of defendant's car was not damaged from the impact. As a result of the collision, the air bag had deployed, and the power steering and radiator fluid containers were shattered and leaking, consistent with the debris which Officer Green saw on the highway.

Defendant's car had significant damage to the front end, passenger side, and gasoline tank. There were white paint transfers embedded in the damaged portions of the black car.

When the officers inspected the scene of the collision, they found a hood emblem, a bumper, and plastic grill piece from an Infiniti vehicle. These pieces were later matched to damaged sections of defendant's car.

The victim's Jeep was extensively damaged, consistent with rolling over several times. There was evidence the headlamps and rear lights were operable and had been activated at the time of the collision.

The officers determined defendant's car Infiniti rear ended the victim's Jeep at a high rate of speed. Defendant's car actually went under the Jeep's rear bumper, and displaced and broke the Jeep's suspension, based on evidence of severe displacement of the suspension and axle. As a result, the Jeep went into a quarter spin, based on abrasion

marks on the road. The momentum from the spin caused the Jeep to roll over on the driver's side and top. The Jeep continued to roll over multiple times as it fell 35 feet down the steep culvert. The officers believed the driver of the Infiniti lost control after it hit the Jeep. The Infiniti skidded out of control, the passenger side swiped a guardrail, and then it drove away.

**Counts IV through VIII**

In addition to counts I through III based on the fatal collision, defendant was also tried in the same proceeding with several offenses arising from another DUI accident which had occurred a few months earlier.

Just after midnight on July 9, 2011, Leah Gilbert was driving on Herndon near Cedar when a black car "came rushing upon us" from behind. Gilbert testified the black car ran two red lights, and she thought it was going more than 90 miles per hour. Gilbert prepared for impact, but the black car swerved and missed her. The black car continued speeding down Herndon, and weaved in and out of traffic. Gilbert immediately called 911 and reported the incident. Gilbert only saw one person in the car, and told the 911 operator the driver was a male.

Also after midnight, Lila Jones and Norris Yancy were leaving an apartment complex near Maple and Herndon. They were walking back to their parked car on Maple, and heard noise from an accelerating car. They saw a small dark or black vehicle hit one parked car on Maple. It bounced off that car, and then hit another parked car which was directly behind Jones's car. The dark vehicle narrowly missed Jones, Yancy, and their car.

Jones testified the dark car's front end was damaged, but it accelerated and continued to the end of the street, and then stopped. Several neighbors emerged from the apartment complex because of the noise from the collision. The dark car remained on the street until the police arrived.

Sarah Hutchinson had parked her grey Toyota on Maple. Shortly after midnight, she walked back to her car and saw several people gathered around it. They were also looking at a black car parked further down Maple. Hutchinson testified there was extensive damage to her parked car. The driver's side back tire was "demolished" and totally flat. It appeared the passenger side of her car had been pressed against the curb, and the hubcap on the passenger side was off. The back left corner of her car was "just messed up." Hutchinson testified a red car which was parked on the street was also damaged.

Hutchinson spoke to the people on the street, who claimed to have seen the incident. She called 911. As she waited for the police, Hutchinson kept watching a black car, which had stopped further down the street. She did not see anyone get in or out of it.

At 12:53 a.m., Officers Sanders and Jacobson responded to the corner of Maple and Herndon, and found a blue car and a red car parked on the side of Maple. Both cars were damaged on the left rear side, consistent with being hit by a vehicle traveling on Maple. A black Infiniti parked one block away. The black car had significant damage on the right front fender, right front wheel, and the wheel well.

When the officers approached the black car, defendant was sitting in the driver's seat and a man was in the passenger seat. Defendant was the registered owner. Officer Jacobson spoke to defendant, and testified she had red, watery eyes, slurred speech, and appeared to be under the influence of alcohol. Defendant got out of the car and there was alcohol on her breath. Officer Jacobson showed defendant the damage to her vehicle. Defendant's responses were slow and delayed, and she gave conflicting replies. She initially said she did not see any damage; then she said there was some damage; and then she again said there was nothing wrong. Jacobson asked defendant if she felt the effects of alcohol. Defendant said, " 'I didn't have no alcohol.' " She failed several field sobriety tests.

The male passenger had a strong odor of alcohol, his speech was slurred, his eyes were bloodshot, and he staggered when he got out of the car. The black car was towed and impounded.

Officer Jacobson concluded defendant was driving while intoxicated and arrested her. He advised defendant of the state's implied consent law, and asked whether she would submit a blood or breath sample. Defendant replied that she did not need to give a chemical test. Jacobson again explained the implied consent law, and defendant did not respond. Jacobson advised defendant that a blood sample would be taken. He placed defendant in his patrol car and drove her to the location where a DUI checkpoint was being held that night. Within five minutes, defendant fell asleep in the patrol car and urinated on herself.

Defendant's blood-alcohol level was 0.21 percent. Such a percentage would have resulted from a person quickly consuming the equivalent of nine to 10 ounces of 0.86 proof whiskey, or four to five beers, "at one go on an empty stomach." Defendant was driving on a suspended license.

Later that morning, around 3:00 a.m., after the police and witnesses were gone, Luis Zavala returned to his red Ford Focus, which had been parked on Maple. He discovered it had been damaged: the doors were bent out of shape, the back axle and body were damaged, and the driver's side tire was flat.

**DEFENDANT'S PRIOR DUI CASES**

The prosecution also introduced the following evidence of defendant's prior DUI cases.

**2006 prior conviction**

Around 9:00 a.m. on January 28, 2006, Officer McAlister responded to a dispatch on Road 88, a rural area just outside Dinuba. He saw a red Toyota going three to five miles per hour on the unpaved right shoulder. The car's hazard lights were on, and the

9.

right tires were in the dirt.  He pulled behind the Toyota but it continued at the slow rate of speed.  McAlister activated his signal lights and the Toyota finally stopped.

Officer McAlister testified defendant was the driver and sole passenger.  Her driver's seat was reclined back, and she appeared disheveled and unkempt.  McAlister smelled the strong odor of an alcoholic beverage from her.  He asked her to get out of the car and she complied.  She was unsteady, wobbly, staggering, and noticeably swaying.  Defendant told McAlister that she was lost, and she could not find her way home.  As they talked, McAlister continued to smell alcohol from her breath, and her speech was slurred.  She failed the field sobriety tests.

Officer McAlister believed she was intoxicated and arrested her for driving while impaired.

As a result of this incident, defendant was charged in the Superior Court of Tulare County with violations of Vehicle Code section 23152, subdivisions (a) and (b).  On February 15, 2006, defendant pleaded no contest to a violation of section 23152, subdivision (b).  She was ordered not to drive with any measurable amount of alcohol in her blood and referred to a driving under the influence school.

The plea contained the following "murder advisement."

> "I understand that being under the influence of alcohol or drugs or both impairs my ability to safely operate a motor vehicle and it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both.  If I continue to drive while under the influence of alcohol or drugs or both and as a result of my driving someone is killed, I can be charged with murder."

Defendant initialed the box next to this paragraph.

## 2010 prior conviction

Around midnight on May 8, 2010, Officer Griffith was on patrol on Shaw Avenue in Clovis and determined a car was blocking other vehicles from crossing through an intersection.  Griffith pulled next to the vehicle.  Defendant was the driver and sole

10.

occupant. Her head was down. Griffith positioned his patrol car behind the vehicle to block other traffic from hitting it, and activated his signal lights.

Officer Griffith briefly activated his siren to get the driver's attention, but there was no response. He aimed his flashlight inside the car and knocked on the driver's side window. Defendant still did not respond.

A small dog was in the car and started to bark. Defendant finally reacted. Officer Griffith asked her to roll down the window. He reached in and turned off the car's ignition. Defendant smelled moderately of alcohol, her eyes were red and watery, and her responses were slow. Griffith asked defendant whether she had been drinking. Defendant said she had stopped drinking between 2:00 p.m. and 2:30 p.m. the previous afternoon. Defendant's performance of the field sobriety tests was poor and consistent with someone who was impaired because of alcohol consumption.

Officer Griffith believed defendant was under the influence of alcohol and arrested her. Defendant elected to have a breath test.

As a result of this incident, defendant was charged with driving with a blood-alcohol level of 0.08 or higher (Veh. Code, § 23152, subd. (b)) and driving under the influence of alcohol or drugs (Veh. Code, § 23152, subd. (a)), with a prior conviction from the 2006 offense. On August 9, 2010, defendant pleaded no contest to a violation of Vehicle Code section 23152, subdivision (b), and admitted the prior conviction. Defendant was ordered to pay various fines and fees, attend a driving under the influence school, ordered not to possess any alcohol, and ordered not to be present in establishments where alcohol was the primary item for sale.

As part of the plea, defendant received another "murder advisement."

"You are hereby advised that being under the influence of alcohol or drugs or both impairs your ability to safely operate a motor vehicle. Therefore, it is extremely dangerous to human life to drive while under the influence of alcohol or drugs or both. **If you continue to drive while under the**

11.

**influence of alcohol or drugs or both and as a result of that driving someone is killed, you can be charged with murder**.

"I understand the Court's warning that I can be charged with murder if I kill someone while driving under the influence of alcohol or drugs." (Bold in original.)

Defendant initialed the box next to the advisement.

## Other prior DUI

On August 20, 2010, Officers Santos and Branston were on patrol on the freeway and saw a dark colored vehicle tailgating another car. The dark colored car moved into another lane, accelerated to 80 to 120 miles per hour, and quickly changed lanes. The officers had a difficult time keeping up with the speeding car. The car pulled off the freeway, and the officers were finally able to catch up with it and perform a traffic stop.

Defendant was the driver and sole occupant. When defendant got out of the car, she was off balance, smelled of alcohol, and her eyes were red and watery. Her performance of the field sobriety tests was poor. Officer Santos concluded she was under the influence of alcohol and arrested her.

## DEFENSE EVIDENCE

Defendant worked in data entry for Lotus Fresno Corporation, which owned radio stations. She introduced evidence from coworkers that she was a hard worker, and she never displayed any evidence of alcoholism at work. They did not know she had a drinking issue or prior DUI arrests.

Emilio Herrera testified that on the night of the fatal collision, defendant attended a concert at Rainbow Ballroom in Fresno with Herrera and several friends. She drank a couple of draft beers, but Herrera did not see her fall down. Defendant and her friends left the concert and went to a restaurant. Herrera drove defendant's car to the restaurant. She ate a little food from Herrera's plate, and drank water and coffee. They later returned to the ballroom. Herrera testified defendant talked normally and did not have any problems walking. At the end of the evening, defendant drove away in her own car.

12.

Herrera followed her for several miles because they were going to the same highway. Herrera testified she was driving 35 to 40 miles per hour. She did not swerve, run red lights, or drive erratically. Defendant entered the freeway, and Herrera went in the other direction.

Dr. Avak Howsepian, a staff psychiatrist at the Veteran's Hospital and assistant professor of psychiatry at UCSF Fresno, testified for the defense. Based on a hypothetical situation similar to defendant's circumstances and the fatal collision, Dr. Howsepian believed her conduct was consistent with "alcohol intoxication delirum."

The defense also called two experts who testified that when defendant hit the rear of Winslow's Jeep, the impact would not have caused Winslow's fatal injuries based on the premise that there was a very small differential in speed between the two vehicles. An expert testified Winslow suffered the fatal injuries from the rollover portion of the accident.[2]

**Defendant's trial testimony**

At trial, defendant testified she "now" realized she was an alcoholic. She started drinking when she was 15 years old to escape her problems. She never drank at work. She never sought help because she did not think she had a problem.

Defendant admitted she was arrested for driving under the influence in 2006, when she was 19 years old. She had been drinking at a concert and got lost when she was driving home. She entered a plea without an attorney. She remembered signing the plea form and knew that the judge warned her that "if I'm caught again … and I cause a death that I could be charged with murder." She attended a DUI school as part of the plea.

---

[2] The defense moved to introduce evidence that the impact from defendant's car could not have caused the Jeep to flip and rollover, which resulted in Winslow's fatal injuries, and that the Jeep had a design defect. The court excluded the evidence.

13.

Defendant also admitted she was arrested in May 2010 for another DUI offense, when her car blocked the intersection. She hired an attorney to represent her. She entered a plea and knew there was another "murder" admonition on the plea form.

Defendant testified about the August 2010 incident, when she was stopped for tailgating a car on the highway. She had two beers and drove very fast to meet her boyfriend. She was stopped by the police and admitted she did not have a license. Defendant said she was "stupid" for doing so after her prior DUIs. She received a ticket, but she was not charged in that case.

Defendant also testified about the July 2011 incident involving the parked cars on Maple. She met a male friend at a bar and drank beer. They were both drunk and decided to head to a friend's house so they could sleep it off. Defendant testified she let her male companion drive because she thought he was in better shape. She fell asleep in the passenger seat. Her friend woke her up and said he had wrecked her car. Defendant got out of the car, but she was so drunk that she did not notice any damage. Defendant was upset and they switched seats, and she got into the driver's seat since it was her car. They talked about what to do, and then the police arrived. Defendant admitted that when the officer talked to her, she lied and said she had not been drinking. Defendant insisted her male companion was driving when her car crashed into the parked cars.

Defendant admitted that after the July 2011 incident on Maple, she called the insurance company and pretended to be her mother. Defendant lied about what happened because she wanted to get her black Infiniti fixed, and "I wasn't on the insurance." As a result, her car was repaired and she kept driving.

As for the fatal crash, defendant testified she went to the concert at the Rainbow Ballroom that night around 9:00 p.m. She was not planning to drink, but a friend offered her beer and "I didn't know how to say no." Other friends offered her more drinks, and "I don't know how to say no. Once I start, I can't seem to stop, I guess." Defendant joined her friends at the restaurant. She felt dizzy and buzzed from the alcohol. She ate

14.

some food and drank coffee at the restaurant to "sober up," and then they returned to the ballroom.

Defendant testified she felt "sober enough and okay to drive" home from the ballroom. Defendant admitted she did not think about her prior DUI arrests or collisions when she started to drive home, or whether she might hurt someone.

Defendant testified she remembered leaving the ballroom's parking lot, and she was sure that she stopped at traffic lights and drove the speed limit. She knew that she turned on Highway 41, took the ramp to Highway 180, and then turned onto Highway 168. However, defendant did not recall driving on either Highway 180 or Highway 168 because her memory was "blurred." "The only thing I remember is basically seeing a lot of flashes, and just I remember kind of – basically the only thing I do remember was seeing a Jeep in front of me and that I was almost gonna hit it."

Defendant remembered that she was in the slow lane, and she tried "to swerve to the side so I wouldn't hit him and I ended up in the middle lane." She remembered the "impact" and "kind of coming to again, that's my next memory, seeing an air bag deployed, seeing how my car was. So I realized that … something happened. I looked around to see if I hit anybody or anything. I didn't see no cars. And then I guess I just – I was scared…. So I just kept driving." Defendant testified she looked around and realized her car was damaged, and the air bag was opened, but she did not see any cars and just kept driving slowly and tried to remember what she hit.

Defendant testified that she was standing on the road with Officer Fief when he told her that Winslow had died in the crash. Defendant disputed Fief's testimony about her reaction to this news. Defendant testified she went into shock, started crying hysterically, and knelt down in a fetal position. Defendant testified she knew she had been drinking that night, and she knew she was driving. Fief put her in the back of the patrol car, and she fell asleep because she was emotionally drained.

15.

Defendant admitted she attended DUI classes after her two prior DUI convictions, but she continued to drink and drive, and her license was still suspended. She did not realize it was dangerous to drink and drive.

> "Q.    You're telling us after going to court and signing a chance of plea form that says drinking and driving is dangerous and if you continue to do so and kill somebody you can be charged with murder, even after that you didn't know that it was dangerous?
>
> "A.    I never thought that that could ever happen to me."

On cross-examination, defendant admitted she was also cited in 2008 for driving without a license, and she drove even though she knew her license was suspended.

## Charges and convictions

Defendant was charged with the following offenses from the fatal collision: count I, second degree murder of Winslow (§ 187, subd. (a));[3] count II, leaving the scene of an accident which caused death (Veh. Code, § 20001, subds. (a), (b)(2)); and count III, misdemeanor driving with a license suspended for a DUI conviction (Veh. Code, § 14601.2, subd. (a)).

In addition, defendant was also charged with committing the following offenses on July 9, 2011, involving the collision into the parked cars on Maple: count IV, misdemeanor driving with a blood-alcohol level of 0.08 percent or higher (Veh. Code, § 23152, subd. (b), § 23578); count V, misdemeanor driving under the influence of alcohol, with two prior convictions (Veh. Code, § 23152, subd.(a)); counts VI and VII, misdemeanor hit and run driving (Veh. Code, § 20002, subd. (a)); and count VIII, driving while her license was suspended for a prior DUI conviction.

_____

[3] As we will discuss in issue I, *post*, the information originally charged defendant with second degree murder and gross vehicular manslaughter. On the first day of trial, the court granted the prosecution's motion to amend the information, which dismissed the manslaughter charge. Defendant contends the court abused its discretion when it permitted the prosecution to dismiss the lesser offense.

16.

After a jury trial, defendant was convicted of counts I through III, involving the fatal collision. The jury was unable to reach verdicts on counts IV through VIII, involving the parked cars; the court declared a mistrial and dismissed those counts.[4] Defendant admitted the allegation in count III that she had a prior suspension of her license.

On August 12, 2014, defendant was sentenced to 15 years to life for count I, with a concurrent term of three years for count II, and time served for count III.

## DISCUSSION

### I.   Amendment of Information

As noted above, defendant was initially charged with count I, second degree murder of Winslow, and the alternative count II, gross vehicular manslaughter of Winslow while intoxicated. On the first day of trial, the court granted the prosecution's motion to dismiss count II and proceed only on the murder charge. On appeal, defendant contends the court abused its discretion when it allowed the prosecution to dismiss the manslaughter charge at that late date, which presented the jury with an all-or-nothing decision on second degree murder, and prevented the jury from considering the lesser manslaughter offense.

We begin with the charging history of this case.

### A.  *The Initial Charges*

On October 24, 2011, the felony complaint was filed which charged defendant with multiple felonies, including count I, murder of Winslow; and count II, gross vehicular manslaughter of Winslow while intoxicated. A first amended complaint was later filed which again alleged counts I and II, plus additional offenses.

---

[4] The jury's inability to reach verdicts on the charges from the July 2011 incident may have been based on defense counsel's insistence in closing argument that there was a reasonable doubt whether defendant was driving the car that night.

On August 15 and 16, 2012, the preliminary hearing was held and defendant was held to answer on all charges.

On August 21, 2012, the information was filed which charged defendant with counts I and II, and other offenses.

On March 28, 2014, defendant moved to set aside the information, particularly count I, murder, for insufficient evidence. The prosecution filed opposition and argued all the charges were supported by the evidence adduced at the preliminary hearing.

On April 10, 2014, defendant offered to plead guilty to gross vehicular manslaughter. Defendant refused to plead guilty to second degree murder and intended to litigate that charge. The prosecutor refused to accept defendant's plea offer for manslaughter based on "her history of prior convictions, her history of obviously open cases, she's a murderer, it's my office's position she is a murderer and she should plead to a murder charge."

On April 11, 2014, the court denied defendant's motion to set aside the information.

### B. Motion to Amend Information

On June 6, 2014, defendant's trial was set to begin with motions and jury selection. The prosecutor moved to file a first amended information which deleted count II, gross vehicular manslaughter while intoxicated. The prosecutor intended to only proceed on count I, second degree murder of Winslow, along with the other charges.

Defense counsel objected and argued such an amendment was grossly unfair on the first day of trial. Defense counsel stated he had been prepared to defend "against gross vehicular manslaughter charge as well as argument for a lesser included offense," and the proposed amendment would change the case to "an all or nothing charge of murder." "[E]ver since I've had this case … my defense, my arguments have been geared towards arguing for a lesser included offense, and now by the People dismissing

18.

that charge of gross vehicular manslaughter, Count 2, they've in essence basically shut down my defense that I've been preparing for."

Defense counsel explained that gross vehicular manslaughter was not a lesser included offense of second degree murder. Defense counsel conceded the prosecutor had advised him of this possibility a week earlier, but it was not a certainty.

The prosecutor replied that his office had charging discretion, and he advised defense counsel the previous week that he was going to dismiss the gross vehicular manslaughter charge. The prosecutor noted that aside from any defense strategy for that charge, defense counsel still had to defend against count I, murder, and the amended information did not change that since the murder charge was independent of the manslaughter count.

### C. The Court's Ruling

The court granted the prosecutor's motion to file the amended information.

> "I do think [defendant's] objection to the filing of the first amended information should be overruled. The Court feels that the People essentially can elect the charges to proceed forward on, and the prejudice is essentially if, for example, they had added some other charge or something that significantly altered the maximum exposure in a way that worked to the prejudice of the defendant, but the dropping of a count, I think, is within the discretion of the People, so the Court is going to overrule that objection."

### D. The Instructional Conferences

During the initial instructional phase, the court asked the parties about any lesser included or lesser related instructions. Defense counsel intended to ask for gross vehicular manslaughter as a lesser related instruction to second degree murder. The court replied that the prosecutor had to agree to a lesser related instruction. The prosecutor confirmed the court's belief that the primary charge was second degree murder "or nothing."

19.

When the parties again addressed the instructions, defense counsel requested an instruction on gross vehicular manslaughter as a lesser related offense of murder. He argued there was sufficient evidence to support the instruction, and the jury should have more than one option in this case. The prosecutor replied there were no lesser included offenses in implied malice/second degree murder.

The court denied defendant's motion for an instruction on gross vehicular manslaughter, and stated the prosecutor had the right to charge the case and pursue an "all or nothing strategy of second degree murder." The court did not instruct the jury on any lesser included or lesser related offenses to murder.

### E. Closing Argument

Prior to closing arguments, defense counsel asked the court if he could tell the jury that the district attorney had dismissed the gross vehicular manslaughter count. The court said no, but that counsel could argue that defendant was guilty of negligence and did not act with malice, or that she acted with "criminal stupidity which does not constitute second degree murder." The court further stated:

> "You can say that she was negligent as far as the court's concerned. I don't think it's particularly helpful to get into a big discussion of what negligence is. I mean, she was – you said she did, I forgot exactly how you phrased it in your opening statement, she did something really dumb, but it did not amount to implied malice. And so I don't think you have to concede the implied malice. Now let me just say, I don't think the district attorney's charging decision comes into that. The argument is whatever she's guilty of she's not guilty of what she's charged with, and whether the D.A. opted to charge her with something or not is not relevant."

In his closing argument, defense counsel conceded defendant made bad decisions but argued she was not a murderer. Counsel argued defendant made an irresponsible and negligent choice to drive that night, under the honest but mistaken belief that she was okay, but she did not act with malice.

20.

*F. Analysis*

Defendant asserts the court failed to exercise its "informed discretion" when it granted the prosecutor's motion to amend the information, because it "simply concluded" the People could elect the charges it was going to proceed on. Defendant asserts the court failed to consider principles of fairness and due process in light of the prosecutor's "last minute motion to amend," which forced the jury with an "all or nothing" choice in this case.

The court did not abuse its discretion. The prosecution has broad discretion to decide which charges to bring against a defendant and the "courts do not generally supervise these 'purely prosecutorial function[s].' [Citations.]" (*People v. Ceja* (2010) 49 Cal.4th 1, 7; *People v. Richardson* (2008) 43 Cal.4th 959, 1013.)

Due process requires that the defendant receive notice of the charges against her so that she has a reasonable opportunity to prepare and present a defense, and not be taken by surprise by evidence offered against her at trial. (*People v. Seaton* (2001) 26 Cal.4th 598, 640; *People v. Fernandez* (2013) 216 Cal.App.4th 540, 554.) Generally, the preliminary hearing transcript provides the accused with the nature of the charges against the defendant, satisfying the due process requirement. (*People v. Jones* (1990) 51 Cal.3d 294, 317–318.)

A defendant's due process rights are not prejudiced by amendment of an information, and the trial court may permit amendment of the accusatory pleading "at any stage of the proceeding, up to and including the close of trial," so long as the defendant's substantial rights are not prejudiced. (*People v. Graff* (2009) 170 Cal.App.4th 345, 361.) An information or indictment, however, "cannot be amended so as to change the offense charged, nor an information so as to charge an offense not shown by the evidence taken at the preliminary examination." (§ 1009; *People v. Winters* (1990) 221 Cal.App.3d 997, 1003; *People v. Fernandez, supra*, 216 Cal.App.4th at p. 554.) " '[A]t a minimum, a defendant must be prepared to defend against all offenses of the kind alleged in the

21.

information as are shown by evidence at the preliminary hearing to have occurred within the timeframe pleaded in the information.'  [Citations.]"  (*People v. Jones, supra,* 51 Cal.3d at p. 317.)

The trial court's exercise of its discretion to grant a motion to amend under section 1009 is broad and will not be disturbed on appeal absent a clear abuse of discretion. (*People v. Jones* (1985) 164 Cal.App.3d 1173, 1178–1179.)

In this case, the court's decision to allow the filing of the amended information did not violate defendant's due process rights because the amendment dismissed the lesser charge.  The amendment retained the more serious charge of second degree murder, which defendant had faced from the beginning of this case.  Indeed, defendant admitted that before the fatal collision, she had been advised after her two prior DUI convictions that she could be charged with murder if someone died as a result of her driving under the influence.  In any event, defendant was arrested on October 21, 2011, shortly after the fatal collision.  The felony complaint was filed on October 24, 2011, and charged defendant with both second degree murder and gross vehicular manslaughter while intoxicated.  The same two charges were included in the first amended complaint. Defendant was held to answer to these charges after the preliminary hearing on August 16, 2012.  On August 21, 2012, the information was filed which again charged defendant with second degree murder and gross vehicular manslaughter while intoxicated, along with other offenses.

More importantly, the amendment did not add a more serious offense or implicate a more serious sentence.  Defendant and her attorney were not taken by surprise that she would still be charged with second degree murder, and presumably her attorney was prepared to defend against murder, in addition to the other offenses in the original information.

Nevertheless, defendant contends the amendment violated her due process rights because the People "do not have a right to insist on a conviction that is harsher than the

evidence warrants." Defendant asserts that in obtaining the dismissal of the manslaughter charge, the prosecutor "accomplished what objecting to a lesser included instruction would not have accomplished. The trial court would have been required to overrule an objection to a lesser included instruction. Here, however, the court permitted the prosecutor to accomplish the same thing by ceding its discretion to the prosecutor to charge whatever he wanted to."

Defendant's arguments are based on a flawed premise that confuses the different due process considerations between lesser included and lesser related offenses. A trial court has a duty to instruct on the general principles of law closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case. (*People v. Breverman* (1998) 19 Cal.4th 142, 154–155.) An accusatory pleading gives notice to the defendant that the prosecution intends to prove all the elements of any lesser necessarily included offense of the charged offense and that the defendant must be prepared to defend against such offenses. (*People v. Birks* (1998) 19 Cal.4th 108, 118.) Accordingly, due process requires a trial court to instruct the jury on lesser necessarily included offenses when there is a question whether all elements of the charged offense are present, provided there is substantial evidence justifying conviction of a lesser included offense. (*People v. Gray* (2005) 37 Cal.4th 168, 219; *People v. Moore* (2011) 51 Cal.4th 386, 408–409.)

In contrast, "a trial court has no sua sponte duty to instruct on lesser related offenses. [Citations.]" (*People v. Lam* (2010) 184 Cal.App.4th 580, 583.) A lesser related offense is one "closely related to that charged and [for which] the evidence provides a basis for finding the defendant guilty of [while finding him] innocent of the charged offense." (*People v. Toro* (1989) 47 Cal.3d 966, 974, disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3.)

A defendant does not have "a unilateral entitlement to instructions on lesser offenses which are not necessarily included in the charge." (*People v. Birks*, *supra*, 19

23.

Cal.4th at p. 136; *People v. Hall* (2011) 200 Cal.App.4th 778, 781.) "A defendant has no right to instructions on lesser related offenses, even if he or she requests the instruction and it would have been supported by substantial evidence, because California law does not permit a court to instruct concerning an uncharged lesser related crime unless agreed to by both parties. [Citations.]" (*People v. Jennings* (2010) 50 Cal.4th 616, 668.) "[A]llowing the defendant to obtain instructions on lesser *uncharged and unincluded* offenses interferes impermissibly 'with ... the prosecutor's discretionary function to select the offenses of which the defendant may be charged and convicted.' [Citation.]" (*People v. Birks*, *supra*, 19 Cal.4th at p. 123, italics added; *People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1116.) There is also no federal constitutional right for a defendant to compel the court to give instructions on lesser related offenses. (*People v. Foster* (2010) 50 Cal.4th 1301, 1343; *People v. Hall*, *supra*, 200 Cal.App.4th at p. 783.)

Thus, the court may choose to grant a defendant's request for a lesser related instruction if substantial evidence supports the instruction and the prosecutor consents. However, the court commits error if it instructs on a lesser related offense over the prosecutor's objection. (*People v. Valentine* (2006) 143 Cal.App.4th 1383, 1387; *People v. Lam*, *supra*, 184 Cal.App.4th at p. 583.)

As applied to this case, it is undisputed that gross vehicular manslaughter is a lesser *related* but not a lesser *included* offense of second degree murder. (*People v. Sanchez* (2001) 24 Cal.4th 983, 991, overruled on another ground in *People v. Reed* (2006) 38 Cal.4th 1224, 1228–1229; *People v. Batchelor*, *supra*, 229 Cal.App.4th at p. 1116.) Indeed, defendant conceded that point at trial and has done so again on appeal. Nevertheless, defendant attempts to conflate the court's due process duty to instruct on lesser included offenses to claim a similar due process violation from the court's decision to grant the prosecution's motion to amend the information and dismiss a lesser related offense. As we have explained, she did not have a due process right to have the jury instructed on the lesser related offense of gross vehicular manslaughter while intoxicated.

The court's decision to grant the prosecution's motion to amend did not violate her due process right to have a jury instructed on all lesser included offenses supported by the evidence.

Defendant next asserts the prosecutor moved to amend the information and dismiss the manslaughter charge to "gain a tactical advantage" over her by waiting until "the last minute." Defendant complains the prosecutor knew defense counsel's strategy was to argue that she committed gross vehicular manslaughter and not murder, but the prosecutor "sandbagg[ed]" counsel and moved to dismiss the manslaughter charge to achieve a "tactical advantage" by depriving her of that defense.

As we have explained, section 1009 "authorizes amendment of an information at any stage of the proceedings provided the amendment does not change the offense charged in the original information to one not shown by the evidence taken at the preliminary examination. If the substantial rights of the defendant would be prejudiced by the amendment, *a reasonable postponement not longer than the ends of justice require may be granted*. The questions of whether the prosecution should be permitted to amend the information and whether continuance in a given case should be granted are matters within the sound discretion of the trial court and its ruling will not be disturbed on appeal absent a clear abuse of discretion…." (*People v. Winters*, *supra*, 221 Cal.App.3d at p. 1005, italics added; *People v. Burnett* (1999) 71 Cal.App.4th 151, 165; *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574, 1580–1581.)

Defendant and her attorney were always aware that she faced the serious charge of second degree murder. While counsel obviously hoped to persuade the jury that defendant was only guilty of the less serious offense of gross vehicular manslaughter while intoxicated, the dismissal of that charge would not have been likely to affect counsel's preparation to defend against the more serious murder count. If the amendment had such an effect, however, counsel could have simply moved for a reasonable postponement, and the court would have been obliged to grant the motion. Counsel's

25.

failure to do so begs the question of whether the dismissal of the manslaughter charge affected his preparation to defend against the murder charge.

Defendant argues the prosecutor's motion to amend was a vindictive act and taken in retaliation for defendant's refusal to plead guilty to second degree murder, and defendant was harmed by exercising her right to a jury trial on the murder charge. "Under the due process clause, prosecutors may not take " 'certain actions against a criminal defendant, such as increasing the charges, in retaliation for the defendant's exercise of constitutional rights. [Citations.] It is not a constitutional violation, however, for a prosecutor to offer benefits, in the form of reduced charges, in exchange for a defendant's guilty pleas, or to threaten to increase the charges if the defendant does not plead guilty. [Citations.] In the pretrial setting, there is no presumption of vindictiveness when the prosecution increases the charges or, as here, the potential penalty. [Citations.] Rather, the defendant must 'prove objectively that the prosecutor's charging decision was motivated by a desire to punish him for doing something the law plainly allowed him to do.' [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 98.)

However, "in the 'give-and-take' of plea bargaining, there is no such element of punishment or retaliation so long as the accused is free to accept or reject the prosecution's offer." (*Bordenkircher v. Hayes* (1978) 434 U.S. 357, 363; see *People v. Matthews* (1986) 183 Cal.App.3d 458, 466–467; *People v. Hudson* (1989) 210 Cal.App.3d 784, 788–789.) "A prosecutor should remain free before trial to exercise the broad discretion entrusted to him to determine the extent of the societal interest in prosecution. An initial decision should not freeze future conduct." (*United States v. Goodwin* (1982) 457 U.S. 368, 382, fn. omitted.)

Defendant never raised a prosecutorial misconduct objection below, perhaps because there is no evidence of vindictiveness in the prosecutor's ultimate decision to only go forward on the murder charge after the failure of plea negotiations.

Finally, we note that the jury was well aware of the decision it faced with the second degree murder charge. The court permitted defense counsel to argue that defendant made an irresponsible and negligent choice to drive that night, under the honest but mistaken belief that she was okay, but she did not act with malice and she was not a murderer. Nevertheless, it found her guilty of murder.

## II.    Amendment of the Abstract

In addition to the felony counts I and II, defendant was charged and convicted in count III of misdemeanor driving with a license suspended for a DUI conviction (Veh. Code, § 14601.2, subd. (a)). She was sentenced to 15 years to life for count I, with a concurrent term of three years for count II, and time served for count III.

Defendant contends the abstract of judgment must be amended because it does not reflect the sentence imposed for misdemeanor count III. "An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize. [Citation.]" (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) The ultimate purpose of the abstract of judgment is to act as a synopsis of the trial court's judgment for prison authorities who are responsible for the execution of the defendant's sentence. (*Ibid*.; *People v. Hong* (1998) 64 Cal.App.4th 1071, 1076.)

The Judicial Council has statutory authorization to determine the contents of what is to appear in the "felony" abstract of judgment. (§ 1213.5; *People v. Hong, supra,* 64 Cal.App.4th at p. 1082.) These forms do not have entries for misdemeanor convictions but permit entries for "other orders." An entry noting a misdemeanor conviction could apparently be made as an "other order" at paragraph 12, though such an entry does not appear to be legally required. We grant defendant's request to modify the abstract accordingly at paragraph 12. (*People v. Kim* (2012) 212 Cal.App.4th 117, 123–124.)

27.

## **DISPOSITION**

The abstract of judgment is amended to include defendant's misdemeanor sentence in paragraph 12.  The trial court shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment.  In all other respects, the judgment is affirmed.

_____

POOCHIGIAN, J.

WE CONCUR:

_____

LEVY, Acting P.J.

_____

FRANSON, J.