Filed 4/13/23  P. v. Richey CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E077961 |
| v. | (Super.Ct.No. RIF2000757) |
| ERIN LEAH RICHEY, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Dean Benjamini, Judge.  Affirmed.

Heather E. Shallenberger, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Daniel J. Hilton, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 2021, a jury convicted Erin Leah Richey of one count of felony assault with a deadly weapon. (Pen. Code, § 245, subd. (a)(1).) The trial court reduced the felony conviction to a misdemeanor and sentenced Richey accordingly. On appeal, Richey argues that the prosecutor engaged in prejudicial misconduct in closing argument and by eliciting purportedly inadmissible testimony. We conclude that Richey has failed to show prejudicial error, and we therefore affirm.

BACKGROUND

Richey represented herself at trial. In September 2019, Richey was an inmate at the Robert Presley Detention Center, a county jail in Riverside, California. Richey was housed in a cell with Lorena B.

One night, a correctional officer became aware that Richey and Lorena were arguing in their cell. The prosecution's only witness in its case-in-chief was one of the three correctional officers on duty in the unit or pod in which the cell was located. Richey pushed a call button to notify the correctional officers that "they were fighting." Lorena yelled out, "'She stabbed me.'" A correctional officer was monitoring the cell by video. A video recording of the incident was played for the jury.

The recording showed Lorena throwing a small container of coconut oil at Richey. Richey then stabbed Lorena with a pencil. Inmates can purchase golf pencils at the commissary or are given them if they do not have any money. A golf pencil is a small pencil. Correctional officers did not recover the pencil. The area in the cell in which the toilet is located is not recorded.

The prosecution's witness testified that correctional officers do not "immediately rush over and enter [a] cell" when physical contact between cellmates is seen on video, because of safety concerns for the officers. Although there are not supposed to be any weapons in the jail, the officer testified that "[a]ll kinds of things can be manufactured to become a weapon," such as spoons that have been sharpened and sugar that has been melted to form a sharp object. The officer believed that the golf pencils that inmates were permitted to use created a "potential danger" because inmates could "sharpen them really, really good against the concrete," and she had seen this happen.

In cross-examining the officer, Richey asked: "Do you consider a golf pencil a deadly weapon?" The officer responded, "I believe that it can become a deadly weapon, yes." Richey asked the officer how such a pencil could be used as a deadly weapon, and the officer responded, "Using it to stab other inmates." Asked where the stabbing would need to be, the officer answered, "Anywhere in the body."

On redirect examination, the prosecutor asked the officer whether she believed that the pencils provided to inmates were capable of causing and likely to cause great bodily injury, and the officer responded: "I don't believe inmates should have them. They have been used multiple times throughout the jails, and I have worked multiple jails, and I have seen many incidents where inmates use them as a weapon because they can be sharpened very sharp, regardless of size." The trial judge asked some follow-up questions, and the officer confirmed that she believed the pencils provided to inmates were deadly weapons.

There was no video evidence that Richey sharpened the pencil on the day of the incident, but the officer could not confirm whether the pencil had been modified, because it was not recovered. After Richey used the pencil "to stab" Lorena, Richey was "feeling the point of the pencil," which caused the correctional officer to believe that it "could have been particularly sharp."

The correctional officer took Lorena to the nurse after the incident because Lorena had an injury "on the top of her head" and was bleeding. The stabbing inflicted puncture wounds on the back of Lorena's hand and on her head. The officer described the puncture wound on Lorena's head as being "little." The pencil punctured Lorena's hand, causing her to have a "little cut" on her finger that was bleeding. A band-aid was placed on Lorena's hand. A photograph of Lorena's hand was admitted, and the officer described it as showing that Lorena's skin appeared "wrinkly," the way skin looks after a band-aid is removed. No injury was visible. The officer confirmed that Lorena had not received "any great bodily injury from the pencil."

Richey refused to give a statement on the night of the incident. She testified on her own behalf. After providing some background information about her education and work history, Richey testified that she "did something that made [her] wind up in jail that was an accident and a mistake, and [she] ha[s] been waiting for trial all that time and having—I have mental issues."

Richey claimed that Lorena was a "pretty bad" cellmate who on the day of the incident had destroyed some of Richey's property and eaten some of Richey's food. Richey reported those incidents to a correctional officer, who said they were monitoring

4

the situation.  Lorena then took off all of her clothes and got "really close to" Richey, which Richey considered "a sexual assault."  Lorena either "ejaculated" or urinated on Richey.  Lorena urinated on Richey's bed linens and threatened Richey.  Richey told a passing correctional officer what was happening, and the officer told Richey that they were handling the situation and would be moving Lorena.

Richey got onto the top bunk bed.  Lorena repeatedly kicked the bottom of Richey's bed and said, "crazy stuff."  Richey got out of bed and stood at the door trying to get help and was holding a pencil in her hand.  Lorena said, "come on, bitch" and charged at Richey, "rush[ing] at [Richey] with a fighting stance."  Lorena then threw "a heavy coconut oil" at Richey "as hard as" Lorena could throw it.  The thrown object grazed Richey and shattered against the wall.  Richey swung her fist with the pencil at Lorena as many times "as it took to stop" Lorena.  Richey feared for her life and believed that she acted with "reasonable force" to protect herself.  Richey described the tip of the pencil she used as being "like a rose thorn," which she admitted "might be" sharp.

The jury was instructed that in order to convict Richey of assault with a deadly weapon the prosecution had to prove that (1) Richey "did an act with a deadly weapon other than a firearm that by its nature would directly and probably result in the application of force to a person," (2) Richey "did that act willfully," (3) when Richey acted, "she was aware of facts that would lead a reasonable person to realize that her act by its nature would directly and probably result in the application of force to someone," (4) when Richey acted, "she had the present ability to apply force with a deadly weapon other than a firearm," and (5) Richey "did not act in self-defense."  (CALCRIM No. 875.)

5

The instructions specified that the prosecution did not need to prove that Richey had "actually touched someone" or caused any injury. As to what constituted a deadly weapon, the jury was instructed: "A *deadly weapon other than a firearm* is any object, instrument, or weapon that is used in such a way that it is capable of causing and likely to cause death or great bodily injury." The jury was further instructed that "[g]reat bodily injury means significant or substantial physical injury. It is an injury greater than minor or moderate harm." (Italics omitted.)

In closing argument, Richey argued that she "didn't want to fight that day" and instead acted in self-defense when she used the pencil against Lorena. Richey also argued that she did not use the pencil as a deadly weapon. As to whether the pencil could have been used as a deadly weapon, Richey stated: "I understand this—this pencil, if I had struck [Lorena] with it and aimed for her eyes and aimed for her throat, or jabbed it into her ear or really meant—or really hit her hard, that—that would be the potentially excessive. Potentially not."

## DISCUSSION

Richey argues that the prosecutor committed prejudicial misconduct and violated her right to due process by (1) questioning Richey about the criminal charges on which she was awaiting trial when the incident occurred, (2) making a purportedly improper analogy during closing argument, and (3) misstating the evidence in closing argument. We conclude that Richey has not shown any prejudicial error.

A. *Governing Law*

"In California, the law regarding prosecutorial misconduct is settled: 'When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated. Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'" (*People v. Masters* (2016) 62 Cal.4th 1019, 1052 (*Masters*).)

Even if prosecutorial misconduct occurs, reversal is not required unless the defendant demonstrates that prejudice resulted. (*People v. Fernandez* (2013) 216 Cal.App.4th 540, 564.) To the extent that prosecutorial misconduct implicates federal constitutional rights, we review the error under the harmless standard of *Chapman v. California* (1967) 386 U.S. 18. (*Fernandez*, *supra*, at p. 564.) We otherwise review the error under the state law harmlessness standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (*People v. Parker* (2022) 13 Cal.5th 1, 71-72 (*Parker*).)

B. *Cross-Examination*

Richey first argues that the prosecutor committed misconduct by questioning Richey during cross-examination about the criminal charges on which she was awaiting trial when the incident occurred. We disagree.

1. *Relevant Proceedings*

Before trial, the prosecution moved to admit evidence of Richey's pending criminal case as rebuttal evidence if Richey introduced evidence of Lorena's purported

"'dangerousness.'" Richey objected and claimed that Lorena had convictions demonstrating "a long stream of violence." The court granted the motion and ruled that if Richey introduced evidence of Lorena's purported "character for violence," then the court would allow the prosecutor to introduce evidence about Richey's "prior violent conduct" in rebuttal.

During trial, the prosecutor asked Richey a question about Lorena's hygiene, and Richey answered that Lorena "is violent, she is a pervert, she was talking gibberish, loudly, she was hurting me." Responding to a later question by the prosecutor about the incident, Richey described Lorena as being "[v]ery violent."

Richey's claim of prosecutorial misconduct concerns a line of questioning that followed Richey's testimony that Lorena was violent. The prosecutor questioned Richey about why she did not want to be housed with Lorena or a prior cellmate. As to the other inmate, Richey responded: The other inmate "was there for breaking her grandma's shoulder with a felony assault and she said she was gonna kill me. So yes, I wanted her out." The prosecutor then asked Richey, "You were there [in jail] for bludgeoning your sister in the head with a hammer?" Richey did not object and answered: "Well, [Lorena]—my sister—that was an accident and a misfortune. My sister wasn't hurt. She had a small laceration. And it wasn't intended to my sister." The prosecutor followed up and asked Richey if her sister had been hurt. Richey objected, and the court sustained the objection.

The prosecutor then asked Richey numerous questions about issues she had with other cellmates. The court sustained an objection by Richey to a question about

8

something that happened between Richey and one of the other cellmates. The prosecutor asked for clarification from the court. The court responded: "To answer your question, that door hasn't been opened in my view, so you are not to go there." Richey objected that the prosecutor already "went there" and moved the court to strike anything concerning her pending criminal charges.

Outside of the presence of the jury, the court explained to Richey that the only reason that any information about her prior criminal charges had been admitted was that she failed to object. The court rejected Richey's argument that the prosecutor had been in contempt by asking Richey about why she was in jail. The court explained: "She's not in contempt. She asked a question that was objectionable. Object to it." The prosecutor repeatedly apologized to the court and explained that she had only asked the question about Richey's pending criminal charges because Richey had repeatedly testified that Lorena was violent. The prosecutor thought that Richey had "swung the door wide open" but acknowledged that she might have "misinterpreted" what had happened. The court indicated that it did not believe that Richey had opened the door to such questioning by testifying that Lorena was violent. The prosecutor said that she would not ask further questions about Richey's pending criminal charges and would not object to the jury being admonished about the prior line of questioning, which the court agreed to do.

The court instructed the jury: "There was a question and answer series earlier in the cross-examination dealing with the facts of the matter by which Ms. Richey was in custody for. That question and that answer is stricken. It has absolutely nothing to do

9

with the facts of this case.  And I am telling you that you must disregard it and you must not consider that, these facts, for any purpose."

2.  *Analysis*

A prosecutor commits misconduct by """*intentionally*""" eliciting inadmissible testimony, but """merely eliciting evidence is not misconduct.""" (*Parker*, *supra*, 13 Cal.5th at p. 76; *People v. Fuiava* (2012) 53 Cal.4th 622, 678-679.)  "It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order." (*People v. Crew* (2003) 31 Cal.4th 822, 839.)

The prosecutor did not engage in misconduct by questioning Richey about the pending criminal charges for which she was awaiting trial in jail.  The prosecution only questioned Richey about the criminal charges for which she was in jail after Richey repeatedly testified that Lorena was "violent."  The prosecutor's line of questioning was permissible under the trial court's in limine ruling that allowed the prosecution to introduce character evidence about Richey's "propensity for violence" if Richey introduced evidence of Lorena's purported "character for violence."  The prosecutor's questions about the pending criminal charges did not violate "any earlier statement by the court that *clearly precluded* the prosecutor from asking such a question." (*People v. Price* (1991) 1 Cal.4th 324, 452, italics added.)

The prosecutor's questions do not appear to be an effort to elicit inadmissible testimony. (*Parker*, *supra*, 13 Cal.5th at p. 77.)  Instead, the line of questioning was a reasonable (and correct) effort to elicit evidence made admissible by the trial court's prior

ruling. (*Ibid.*) We accordingly conclude that the prosecutor's questions about Richey's pending charges did not constitute misconduct.

C. *Closing Argument*

Richey also argues that several remarks the prosecutor made during closing argument amounted to prosecutorial misconduct. The People concede and we agree that the prosecutor misstated the evidence and thus committed misconduct, but we conclude that the error was not prejudicial. We reject Richey's other claim of misconduct.

Richey first argues that the prosecutor committed misconduct by improperly implying "that the crime of felony assault with a deadly weapon, to wit. a pencil, was tailored to the facts of this case when [the prosecutor] argued to the jury that the use of a pencil during an assault would be just as egregious as the use of a firearm or machete." Richey's argument is based on the following italicized remarks the prosecutor made during closing argument: "The defendant is charged with assault with a deadly weapon. *And if you have no legal training at all, that probably sounded fairly egregious to you. And you were probably waiting for some evidence that someone got shot in the head or flayed with a machete or something like that.* [¶] But that's not the law. That would be a different kind of a crime, maybe an attempt murder or a battery. [¶] But an assault isn't about what actually does happen." (Italics added.) The prosecutor's argument was that Richey's attack on Lorena with a pencil amounted to assault with a deadly weapon even though the attack was not as egregious as using a firearm or a machete to commit assault. The prosecutor thus did not equate the underlying attack with an assault committed by using a firearm or a machete. We accordingly reject Richey's argument to the contrary.

11

Richey next argues that the prosecutor committed misconduct by telling the jury that Lorena's injury required stitches even though, according to Richey, there was no evidence that Lorena had received " any kind of medical treatment, let alone stitches." We agree that there was no evidence that Lorena received stitches, but we conclude that the error was harmless.

During closing argument, the prosecutor identified and described each of the elements of assault with a deadly weapon that she had to prove. In discussing the deadly weapon component of the first element, the prosecutor reiterated the instruction's definition that a deadly weapon is "any object that is used in such a way that it is capable of causing and likely to cause death or great body injury." The prosecutor acknowledged that pencils were not designed to hurt or to kill, but she explained that the law focused on whether the pencil was "'likely to cause great injury or death'" and that she did "not have to prove that pencil is inherently or always deadly." The prosecutor told the jury that she did not have to prove that Richey could have killed Lorena but instead had to prove that Richey "could have and that her actions were likely to cause great bodily injury," which the prosecutor explained means "something more than minor or moderate harm." The prosecutor admitted that the injuries sustained by Lorena were "minor" and "not substantial or significant." The prosecutor then stated: The injuries "were no more than minor or moderate harm. [Lorena] started bleeding. [Richey] broke skin, and [*Lorena*] *had to get stitches. If it was bad enough to get stitches, that's great bodily injury.* [¶] But that's not what we're concerned with here. The injuries actually received are not

what is important. This is about what could have happened, what is likely to happen when we go around stabbing people in the head with pencils." (Italics added.)

The prosecutor then argued that the pencil was used as a deadly weapon because it could have inflicted great bodily injury, not because it had in fact caused great bodily injury. As to Richey's use of the pencil, the prosecutor described the incident as Richey "simply jabbing, jabbing, jabbing at [Lorena's] head. [Richey] had no control. She was in a blind rage, stabbing again and again and again. [¶] Lucky [Lorena's] response was to give the defendant the hardest part of her skull. But what if [Lorena] had turned her head to look up and see if the defendant was done yet? [Lorena] would have taken a pencil to the eye. Do you have any doubt that that would cause her a substantial or serious injury? A pencil to the side [of] the cheek is going to cause a lot more damage than one to the skull. [¶] . . . The fact that [Lorena] was able to protect herself from substantial injury doesn't mean that the defendant could not have and wasn't likely to inflict substantial injury."

Because there was no evidence that Lorena received stitches, the prosecutor committed misconduct by telling the jury that Lorena had received stitches. (*People v. Hill* (1998) 17 Cal.4th 800, 823.) That misstatement of the evidence, however, was not so egregious that it infected "the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process." (*Masters*, *supra*, 62 Cal.4th at p. 1052.) The error instead amounted to an error of state law. We thus analyze whether there was a reasonable probability that the jury would have reached a verdict more favorable to Richey absent the misconduct. (*Parker*, *supra*, 13 Cal.5th at pp. 71-72.)

13

There was strong evidence of Richey's guilt if the jury rejected Richey's claim of self-defense and found that the pencil was a deadly weapon. Richey admitted that she stabbed Lorena with the pencil, and a video recording of the incident was played for the jury in which Richey is shown stabbing Lorena with a pencil. Thus, once the jury concluded that Richey had not acted in self-defense, the critical issue left for it decide was whether the pencil was a deadly weapon.

The jury was instructed that to prove that the pencil Richey used was a deadly weapon, the prosecutor had to prove that the pencil was "used in such a way that it [was] capable of causing and likely to cause death or great bodily injury," meaning an injury involving "greater than minor or moderate harm." Thus, when the prosecutor told the jury that Lorena "had to get stitches" and "[i]f it was bad enough to get stitches, that's great bodily injury," the prosecutor was in essence telling the jury that the pencil had already caused great bodily injury so it was capable of causing great bodily injury and thus was a deadly weapon. The prosecutor's misstatement thus went to the heart of the issue the jury had to decide if it rejected Richey's claim of self-defense, which it did.

The prosecutor's misstatements nevertheless were harmless because of the evidence that that the pencil was used in such a way that it was capable of and likely to cause great bodily harm. The correctional officer testified that a golf pencil could be used as a deadly weapon to stab inmates anywhere on their bodies. The officer further explained that inmates can sharpen the pencils to be "very sharp." Richey admitted that the pencil she used could have been sharp and that it felt "like a rose thorn." Richey used the pencil to stab Lorena in the head. And the pencil caused puncture wounds on

14

Lorena's head and hand. Thus, there was ample evidence from which a reasonable jury could infer that the pencil Richey used was sharp and was used in a manner capable of and likely to cause great bodily injury.

In addition to this evidence, the jury was instructed that it "alone" would "decide what happened, based only on the evidence" presented at trial, which it was instructed meant "the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else [the judge] told [them] to consider as evidence." The jury was further instructed: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." In closing argument, the prosecutor reiterated this point and told the jury: "As important as I like to think I am, nothing that I say is actually evidence in the case. You determine that based off of what was said by witnesses on the witness stand." We assume that the jurors followed the instructions (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1345) and thus were able to distinguish between the evidence concerning Lorena's injury and the prosecutor's misstatements.

There was ample evidence contradicting the prosecutor's mischaracterization of the injury. A photograph of the injury was admitted. The officer described the puncture wound on Lorena's hand as being a "little cut" on her finger that bled. The only medical treatment needed for the cut was a band-aid. Moreover, the officer confirmed that Lorena had not received "any great bodily injury from the pencil."

Given the strong evidence that the pencil was used as a deadly weapon, the ample evidence that Lorena's injury did not require stitches, and the instructions that the

15

statements by the attorneys are not evidence, we conclude that it is not reasonably probable that the jury would have reached a verdict more favorable to Richey absent the prosecutor's misstatements about Lorena's injury.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ
J.

We concur:

FIELDS
Acting P. J.
RAPHAEL
J.

16